In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-3759

SUSAN WHITTAKER,

*Plaintiff-Appellant,*

*v.*

NORTHERN ILLINOIS UNIVERSITY,
STEVEN WILHELM, SR., an individual,
and JON SLATER, an individual,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 00 C 50447—**Philip G. Reinhard**, *Judge.*

ARGUED JUNE 8, 2005—DECIDED SEPTEMBER 21, 2005

Before CUDAHY, EVANS, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Plaintiff Susan Whittaker sued her former employer and supervisors under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1983, claiming that the defendants subjected her to a hostile work environment, sex discrimination, and retaliation. The district court granted summary judgment in the defendants' favor on all three counts, finding that Whittaker had failed to proffer sufficient evidence in support of her claims. Because most of the offensive comments giving rise to the plaintiff's claim were made outside of her presence and unbeknownst to her, and because those that were directed at her were relatively

isolated, we affirm the grant of summary judgment in the defendants' favor on her hostile work environment claim. We also affirm the grant of summary judgment in the defendants' favor on her sex discrimination and retaliation claims, finding that Whittaker has failed to create a genuine issue of material fact as to whether she suffered an adverse employment action.

## I. BACKGROUND

The plaintiff, Susan Whittaker, was a building services worker at defendant Northern Illinois University (NIU) from October 1988 through May 1999. During the last thirteen months of her employment there, her foreman was defendant Jon Slater. As Whittaker's foreman, Slater oversaw Whittaker's daily assignments and gave her periodic evaluations. As foreman, he was authorized to reprimand his crew orally, but beyond that he could only recommend higher levels of discipline. Decisions of higher discipline, such as written warnings and suspensions, were left to Slater's boss—Thomas Folowell, the Assistant Superintendent of Building Services. Folowell's disciplinary decisions would be made in consultation with NIU's human resources staff and Slater, and were subject to review and grievance procedures pursuant to the collective bargaining agreement between NIU and the building services workers' union. Under this agreement, a grievance could be initiated by an employee or the union provided that it was filed within ten working days after the protested employment decision became known. Grievances were heard and decided by Thomas Morelock, NIU's Labor Relations Officer.

According to her employment record with NIU, Whittaker's job performance problems began in earnest in 1999 when she began taking several unscheduled absences. In particular, Slater faulted her for not following the

applicable call-in procedure and for abusing sick leave to take vacation. Pursuant to NIU's call-in procedure for building workers, employees who take an unscheduled absence are required to inform the foreman's office of the absence during a twenty minute period beginning ten minutes before their scheduled start time. The start time for Slater's crew was 6:00 a.m.

After missing work on March 9, 1999, without calling in within ten minutes of her start time, Whittaker received a written warning from Folowell pursuant to Slater's recommendation. On April 27, 1999, she again failed to call in absent within the designated twenty minute window. This absence prompted Slater on May 3, 1999, to recommend that Whittaker be given a three-day suspension without pay. After receiving Slater's recommendation and reviewing the plaintiff's employment record, Folowell issued the suspension, which was to be served between May 31 and June 2, 1999. Though this was only Whittaker's second occurrence of absenteeism, and though evidence suggests that NIU does not normally suspend its employees for unexcused absences until the sixth occurrence, this suspension was explicitly premised on Whittaker's "insubordination," of which her absenteeism was only a part.

On May 4, 1999, Slater recommended that Whittaker be suspended for another ten-day period for abusing sick leave to take vacation time. This recommendation was premised on requests for vacation time that Whittaker had made for two three-day periods back in March and April 1999, which Slater had denied because she had not accrued enough vacation time to cover the requested absences. Whittaker, however, called in sick on those days, prompting Slater to conclude that she was abusing her sick leave to take vacation. Folowell agreed, and issued the suspension. Whittaker, however, successfully contested this suspension through internal grievance procedures.

While Whittaker did not deny her initial requests for vacation on those days in question, nor produce any evidence corroborating her claim that she was sick on those days, Morelock, in deciding the grievance in Whittaker's favor, found that one of the days in question had already served as the basis for her three-day suspension, and thus potentially gave rise to a "double jeopardy" situation counseling against the subsequent ten-day suspension. Whittaker was nonetheless placed on "proof status" as a result of the ordeal, thereafter requiring her to produce proof of sickness in order to receive sick leave.

Whittaker, however, claims that the defendants stacked her performance record against her, and that the employment actions taken against her were in fact not the product of poor job performance, but rather unlawful motives. Specifically, she claims she was subject to gender discrimination, retaliation, and a hostile work environment. In support of these claims, Whittaker brought evidence that Slater and Folowell were both aware that she had filed charges of sexual harassment against Slater's predecessor—defendant Steven Wilhelm—in 1990. Indeed, Slater admitted that Wilhelm had told him about the charge, and Linda Dvorak, another foreman who had supervised Whittaker, stated that Wilhelm frequently complained about the charge in the presence of Slater and Folowell. According to Dvorak, Wilhelm told her and Folowell that he was "going to get that fucking bitch," and that he "hated" Whittaker for filing the 1990 charge against him.

In addition, Whittaker claims that Slater had, before becoming her foreman, twice invited her in the presence of another employee to join him for a "weekend of fishing and other things" on his boat. According to the plaintiff, Slater made another offer to go fishing together after he became her foreman, again in the presence of another employee, but she declined and he never asked again.

Thereafter, according to Dvorak and John Hetland (a temporary foreman), Folowell, Wilhelm, and, to a lesser extent, Slater began calling Whittaker derogatory names when outside her presence, such as "bitch," "dumb blond," "stupid cunt," "fucking slut," "fucking lazy bitch," and "goddamn whore." Notwithstanding the vile tenor of these alleged remarks, there is no evidence that Whittaker was aware of them before she stopped working at NIU on May 16, 1999.

Whittaker's May 1999 departure from NIU occurred when she took a leave of absence from which she never returned. Because she stopped working at NIU on May 16, 1999, her three-day suspension, which had been scheduled to take place from May 31 to June 2, never took effect.

On June 21, 1999, the plaintiff filed an internal charge of discrimination with NIU, alleging that she had been subject to sexual harassment. On November 8, 1999, she filed charges of discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC). After receiving a right-to-sue letter from the EEOC, Whittaker sued NIU, Slater, and Wilhelm, ultimately claiming under Title VII of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000e *et seq*.) and 42 U.S.C. § 1983 that the defendants subjected her to a hostile work environment, gender-based discrimination (based on disparate treatment), and retaliation. Finding that Whittaker had failed to proffer sufficient evidence in support of her claims, the district court granted summary judgment in the defendants' favor. Whittaker appeals.

## II.  ANALYSIS

### A.  Standard of Review

"We review a district court's decision to grant a motion for summary judgment *de novo*, construing all facts, and drawing all reasonable inferences from those facts, in favor of the nonmoving party." *Telemark Dev. Group, Inc. v. Mengelt*, 313 F.3d 972, 976 (7th Cir. 2002). Summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B.  Whittaker Cannot Show Hostile Work Environment

Pursuant to Title VII, "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Accordingly, this statute prohibits employers from "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 701 (7th Cir. 2001).

To prevail on her hostile work environment claim, Whittaker must establish that: "(1) she was subjected to unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer

liability." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004). To prove "hostile work environment," the alleged harassment must be "both subjectively and objectively so severe or pervasive as to alter the conditions of her employment and create an abusive working environment." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004). "In determining whether the environment was objectively hostile, a court must consider all of the circumstances, including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." *Id.* at 975-76. Indeed, the threshold for plaintiffs is high, as "[t]he workplace that is actionable is one that is 'hellish.'" *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997).

Here, there is evidence that Whittaker's supervisors referred to her in explicit, derogatory, and sexist terms. However, these references were made outside her presence, and there is no evidence that she was aware of these defendants' remarks during her tenure with NIU. Indeed, an objectively hostile work environment will not be found where "[m]ost of the conduct that forms the basis of [a plaintiff's] claim consists of derogatory statements made by supervisors or co-workers out of her hearing," and the rest is "isolated and not particularly severe." *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005); *see also Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998) (rejecting hostile work environment claim where most of the offensive comments giving rise to the claim were not directed at the plaintiff, and those that were directed at plaintiff were isolated).

As for the arguably offensive comments that were made in Whittaker's presence—namely, Slater's propositions that Whittaker join him on his boat for "a weekend of drinking and other things" (only one of which was made while he was her supervisor)—the behavior, while questionable, was

relatively isolated, and alone not actionable. It is well settled that "relatively isolated instances of non-severe misconduct will not support a claim of a hostile environment." *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993). Indeed, relatively isolated behavior far worse than Slater's has been found inactionable. For example, in *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993), the defendant allegedly "asked [the plaintiff] for dates, called her a 'dumb blond,' put his hand on her shoulder several times, placed 'I love you' signs in her work area and attempted to kiss her in a bar," and "may have twice attempted to kiss her in the office." Nonetheless, we found that these incidents were "relatively isolated" and thus failed to meet the standard for actionable sexual harassment. *Id.* Likewise, in *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995), the plaintiff in support of her hostile work environment claim adduced evidence that her employer had over the course of seven months called her a "pretty girl"; made grunting noises as she left his office wearing a leather skirt; told her that his office did not get "hot" until she stepped into it; joked that "all pretty girls [should] run around naked" in the office; likened her to Anita Hill in acknowledging his tendency to share comments of a sexual nature with her at the office; and once made gestures suggesting masturbation while conversing. Despite all this evidence of "vulgar," "coarse," and "boorish" behavior, we overturned a jury verdict in the plaintiff's favor, noting that "[a] handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." *Id.* at 431.

Also relevant to our assessment of the impact of the defendants' behavior is the fact that none of them physically touched or threatened Whittaker, nor did they demand sexual favors or make lewd comments or obscene gestures to her face. *See Gleason v. Mesirow Financial, Inc.*, 118 F.3d

1134, 1145 (7th Cir. 1997) (finding "it important to take into account what [the defendant] did *not* do" in rejecting hostile work environment claim, including not touching the plaintiff, not propositioning her for sex, not threatening her, not exposing himself, not showing her dirty pictures, nor ever saying "anything to her that could not be repeated on prime-time television") (citing *Baskerville*, 50 F.3d at 431). Nor did Whittaker complain about Slater's propositions during her employment. *Wolf v. Northwest Ind. Symphony Society*, 250 F.3d 1136, 1144 (7th Cir. 2001) (citing the plaintiff's failure to "criticize [his boss] for sexually harassing him *during* his employment" as undercutting his hostile work environment claim). As the district court found, the evidence here shows offensive conduct, but, as almost all of it—and certainly the worst of it—occurred unbeknownst to plaintiff, the conduct was not so frequent, humiliating, or threatening as to create a hostile environment. Accordingly, we affirm the district court's grant of summary judgment in defendant's favor on Whittaker's hostile work environment claim.

## C. Whittaker Has Failed To Show an Adverse Employment Action

Title VII also prohibits employers from treating employees differently on the basis of sex. *See* 42 U.S.C. § 2000e-2(a)(1). To establish a claim of sex discrimination, or disparate treatment, a plaintiff can proceed either directly, by presenting direct and/or circumstantial evidence of the employer's discriminatory intent, or indirectly, through the burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Wyninger*, 361 F.3d at 978. The *McDonnell Douglas* burden-shifting approach can also be used to establish indirectly a claim of retaliation

in violation of 42 U.S.C. § 2000e-3(a).[1] *See Wyninger v. New Venture*, 361 F.3d 965, 981 (7th Cir. 2004). Whittaker here proceeds under the indirect method on both her sex discrimination and retaliation claims. Accordingly, we will address these two claims in tandem.

To establish a sex discrimination claim under the indirect method, the *McDonnell Douglas* burden-shifting approach provides as follows: (1) the plaintiff must establish a *prima facie* case of discrimination based on her membership in a protected class; (2) once a *prima facie* case is made, a presumption of discrimination is established and the burden shifts to the defendant to provide a legitimate, non discriminatory reason for the challenged action; and (3) once the defendant meets that burden, the plaintiff must establish that those proffered reasons were mere pretext. *See, e.g.*, *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885-86 (7th Cir. 2001). In turn, to establish a prima facie case of sex discrimination, a plaintiff must show that (1) she is a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated male employees. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).

To establish a claim of retaliation under the indirect method of *McDonnell Douglas*, a plaintiff must establish that "(1) after lodging a complaint about discrimination, (2) only he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse

---

[1] 42 U.S.C. § 2000e-3(a) provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

employment action even though (4) he was performing his job in a satisfactory manner." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002). Thereafter, the familiar burden-shifting approach again takes hold, requiring the defendant to come up with a noninvidious reason for the adverse action; "[o]therwise there must be a trial." *Id.* at 644.

So, whether it be her sex discrimination or retaliation claim, Whittaker must show that she suffered an adverse employment action. Indeed, we need look no further than this required element—and Whittaker's failure to satisfy it—to dispose of both claims. "Typically, adverse employment actions are economic injuries." *Markel v. Board of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002). For that matter, a suspension without pay—such as the three-day suspension that Whittaker was scheduled to serve between May 31 and June 2, 1999—would constitute an adverse employment action. *See id.* However, because she voluntarily left her job in mid-May—taking a leave of absence from which she would never return—she never actually served this suspension. And because she never served the suspension, she never realized any economic effect from the slated employment action. Simply put, a suspension without pay that is never served does not constitute an adverse employment action. *See Stavropoulos v. Firestone*, 361 F.3d 610. 617 (11th Cir. 2004) ("[A]n action which, it turns out, had no effect on an employee is not an 'adverse action.'").

Of course, "adverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) (quoting *Collins v. State of Illinois*, 830 F.2d 692, 703 (7th Cir. 1987)). "[T]he adverse action must materially alter the terms and conditions of employment." *Stutler v. Ill. Dept. of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001). The terms and

conditions of Whittaker's employment, however, were never so altered. While Whittaker's negative evaluation, written warnings, and placement on "proof status" are putatively disciplinary measures, none "result[ed] in tangible job consequences and therefore are not adverse employment actions actionable under Title VII." *Longstreet v. Ill. Dep't of Corrections*, 276 F.3d 379, 384 (7th Cir. 2002) (holding that plaintiff's "negative performance evaluations and being required to substantiate that her absences from work were illness-related . . . did not result in tangible job conse-quences and therefore are not adverse employment actions actionable under Title VII"); *Oest v. Ill. Dep't of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001) (holding that neither "unfavorable performance evaluations" nor "oral or written reprimands" constitute adverse employment actions under our case law).

Certainly, we can conceive of reprimands that carry with them immediate, albeit non-economic, consequences that in and of themselves go so far as to materially alter the terms and conditions of employment. For example, if a written warning also led to "ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities," perhaps then we would find an action that is adverse. *See Oest*, 240 F.3d at 613. But Whittaker has adduced no evidence of such immediate consequences here. And while one might argue that "each oral or written reprimand brought [the plaintiff] closer to termination[,] [s]uch a course was not an inevita-ble consequence of every reprimand . . . ; [rather,] job-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship." *Id.*

Before closing, we must note that the standards for actionable adverse action for discrimination claims under § 2000e-2(a) and retaliation claims under § 2000e-3(a) are not identical. "Section 2000e-3(a) is 'broader' than

§ 2000e-2(a) in the sense that retaliation may take so many forms, while § 2000e-2(a) is limited to discrimination 'with respect to [the worker's] compensation, terms, conditions, or privileges of employment.'" *Washington v. Ill. Dep't of Revenue*, No. 03-3818, slip op. at 3 (7th Cir. August 22, 2005); *see also Herrnreiter*, 315 F.3d 742, 746 (7th Cir. 2002) (recognizing that, to be actionable under Title VII, retaliation need not involve "an actual *employment* action"). In the retaliation context, an employer's action will be actionable under § 2000e-3(a) if it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Washington*, slip op. at 7. Nonetheless, Whittaker's claim, reduced to written reprimands, falls short of this broader standard as well. Accordingly, the plaintiff's sex discrimination and retaliation claims must fail.

While Whittaker does not argue constructive discharge, we pause for good measure to note that she would lose on that score as well. "Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking redress." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). Because, as we have already found, Whittaker has failed to show work conditions so egregious as to meet the stringent hostile work environment standard, she certainly cannot reach the even higher threshold required to show a constructive discharge.

As Whittaker cannot establish that she was subject to an adverse employment action, she has failed to make her claims of disparate treatment and retaliation. We affirm the district court's grant of summary judgment in the defendants' favor on these counts accordingly.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in the defendants' favor on plaintiff's claims of hostile work environment, sex discrimination, and retaliation.

A true Copy:

      Teste:

                      _____

                      *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*