In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-1157

WILLIAM NAGLE,

*Plaintiff-Appellant,*

*v.*

VILLAGE OF CALUMET PARK,
MARK DAVIS, SUSAN I. ROCKETT,
BUSTER B. PORCH, MELVIN DAVIS,
and JOHN RIGONI,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 7039—**Matthew F. Kennelly,** *Judge.*

ARGUED DECEMBER 5, 2007—DECIDED FEBRUARY 4, 2009

Before FLAUM, EVANS, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* William Nagle is a police
officer with the Village of Calumet Park, Illinois Police
Department. He is suing the Village and certain individ-
ual defendants, claiming he has been discriminated
against because of his race and age. Nagle maintains that
after he complained about his treatment and filed charges

with the Equal Employment Opportunity Commission ("EEOC"), the defendants retaliated against him. Nagle also brings a claim under 42 U.S.C. § 1983, alleging that the individual defendants violated his First and Fourteenth Amendment rights. He contends that he was retaliated against through unwarranted written reprimands and a suspension after he made statements at a union meeting regarding manpower reductions of police officers within the community.

We find that Nagle has not sufficiently shown that he was discriminated against on the basis of age and race or that he suffered retaliation because of his complaints. Furthermore, Nagle cannot show that he engaged in protected speech at the union meeting. Therefore, we affirm the district court's grant of summary judgment in its entirety.

## I. BACKGROUND

William Nagle, a white male who was fifty-four at the time of the filing of this suit, is an officer with the Calumet Park Police Department. Nagle, who has served for twenty-eight years, is the officer with the most seniority in the department. In the early 1980s, Nagle helped form a local union to represent Calumet Park police officers. He has served as the union's vice-president and, most recently, as its safety and grievance officer. Between 2002 and the filing of this suit, he filed over 100 grievances on behalf of himself and the union's membership. The majority of the grievances were filed on behalf of the union.

In August 2002, Buster Porch, the black mayor of Calu-met Park, appointed Mark Davis, a 59-year-old black male, as Chief of Police. Chief Davis then appointed Susan Rockett, a 48-year-old white female, to be Assistant Chief. Nagle maintains that after Davis's appointment, he sub-jected Nagle to age and race discrimination through unwarranted discipline and reassignment to undesirable duties on various occasions. This behavior allegedly started shortly after Davis's appointment where, during a conversation at another officer's retirement party, Chief Davis asked Nagle when he planned to retire.

Following this incident, Nagle contends that Chief Davis made other disparaging remarks regarding Nagle's age and race, and systematically treated younger, non-white officers better than older, white officers. Chief Davis allegedly referred to Nagle and his peers as "these old white mother f—-ers" approximately fifteen times over a three-year period. Nagle also maintains that Chief Davis made disparaging remarks based on age when reprimanding Nagle for his "failures" on the job. For example, on May 24, 2004, Nagle received a written reprimand for allowing a prisoner to escape with handcuffs on while Nagle was walking him to the car. According to Nagle, Chief Davis later commented that Nagle might be getting too old for the job and needed additional training in apprehending suspects, but did not similarly discipline Mario Smith, a "younger" officer, who allowed a prisoner to escape in June 2005. Furthermore, Nagle maintains that in February 2006, Mark Smith, a non-white, lateral officer under forty who was still on proba-

tion, shot an unarmed suspect but was not placed on administrative leave during the investigation as protocol would normally require.

On August 15, 2004, Nagle received a three-day suspension for failing to assist another officer during a domestic disturbance call. Nagle and Officer Willie Vaughn, a black male whose age is unspecified in the record, were dispatched to respond to a 911 call that a teenage girl was threatening her mother and grandmother with a knife. While both Nagle and Vaughn stood outside speaking with the mother, Sergeant Rigoni, a 49-year-old white male and also a defendant here, arrived and went inside where he was injured while handcuffing the girl. Sergeant John Rigoni recommended to Chief Davis that Nagle be terminated for failing to assist in the arrest, but instead, Chief Davis suspended Nagle for three days. Nagle maintains that his suspension was discriminatory because Officer Vaughn also failed to act while on this call, but was not similarly disciplined.

Nagle also claims he was reassigned to undesirable duties because of his age and race. In October 2003, Nagle was reassigned from patrol duty to the evidence locker. In March 2005, Chief Davis and Assistant Chief Rockett assigned Nagle to the newly created position of senior liaison after no other officers volunteered. In September 2005, Chief Davis created a new strip mall detail at the Raceway Shopping Plaza, and Nagle's job assignment was changed from street patrol to a fixed post at the shopping plaza. Nagle kept his same rate of pay; however, Nagle claims that only white officers were permanently

assigned to strip mall detail while younger, non-white officers were assigned to the detail by sergeants at roll call.

Nagle also maintains that comments made by others within the department support his race and age discrimination claims and show that there was a general bias against older, white officers. Sometime around January 2005, the department engaged in an effort to bring in lateral transfers. According to Nagle, Commander Melvin Davis (a black male, age unknown, who is also a defendant here, to be distinguished from Chief Mark Davis) was placed in charge of choosing the new hires, and he chose primarily non-white officers under forty.[1] Nagle contends that Commander Davis exhibited age-based bias when he told some new hirees during their orientation period that they did not have to show respect to Sergeant Mark Groszek, a white male over forty.

Nagle points to one other incident involving Commander Davis, where two out of five lateral transfers failed the shooting qualification course, and Commander Davis removed the instructor and hired another individual to teach the course. In his letter removing the instructor, Commander Davis wrote, "[t]his administration must start investing in our officers, who believe in the current

---

[1] Nagle claims that, during the interviews, Commander Davis noted "?Age" as a question in deciding whether to interview an applicant because he wondered if the Police Board would be interested in an applicant in his late fifties. However, we could not find the portion of the record that Nagle cites to support this proposition.

leadership, and that can give this department another (20-30) years of positive service."

In December 2002, Chief Davis issued an order prohibiting officers from calling in sick on the day before or the day after their off-day. This was followed by a February 2003 order calling for progressive discipline concerning violations of the new sick leave policy. Nagle contends that Chief Davis used this policy to discriminate against Nagle because of speech that he engaged in pursuant to his union duties. On May 12, 2004, Nagle attended a Labor-Management meeting and expressed concerns about Chief Davis's proposed manpower reductions. On May 17, 2004, Nagle's first working day after the meeting, Chief Davis told Nagle that if he ever spoke to Chief Davis in the same manner as Nagle had in the meeting, Nagle would be disciplined. Chief Davis felt Nagle disrespected him in front of other officers. On May 19, 2004, Nagle received a two-day suspension for violating the sick leave policy. Nagle believes that this suspension was in retaliation for his comments at the Labor-Management meeting. Nagle was previously suspended for violating the sick leave policy in September 2003. In fact, half of the department had been suspended since the new policy was implemented. In April 2005, Nagle was again suspended for violating the sick leave policy, but he filed a grievance and the suspension was never served.

On January 19, 2005, Nagle filed a charge with the EEOC, alleging age discrimination. This charge came on the heels of Chief Davis's comments to Nagle that he was "tired of

[Nagle's] bullsh—grievances" and his reminder to Nagle that "discipline is progressive." The EEOC charge was mailed to the police department to the attention of the personnel manager on January 27, 2005.

Nagle's second EEOC charge soon followed. On January 23, 2005, Chief Davis saw Nagle preparing a grievance form during lunch, which is considered on duty time at the department. On February 11, 2005, Chief Davis suspended Nagle for three days for this incident. Nagle filed a union grievance, and the Illinois Labor Relations Board overturned the suspension and ordered the department to reimburse Nagle for his losses. On February 23, 2005, Nagle filed a second EEOC charge alleging he had been suspended due to his age and race and in retaliation for his January EEOC filing.

On May 9, 2005, Nagle filed a third EEOC complaint alleging that his March 2005 assignment to senior liaison and his April 2005 suspension were due to his age and race and were in retaliation for his earlier EEOC complaints. On May 10, 2005, Assistant Chief Rockett rescheduled Nagle's "court key date," or the date in which he attends court proceedings. Nagle has had the same date for nearly twenty-seven years and argues that the change was made because of his age, race, and in retaliation for his complaints of discrimination.

Finally, Nagle was assigned to strip mall detail in September 2005, an assignment which he believes was discriminatory. Nagle filed a complaint in the district court on December 14, 2005 and an amended complaint on February 8, 2006, alleging age discrimination under

the ADEA, 29 U.S.C. § 621 *et seq.*, and race discrimination and retaliation under Title VII, 42 U.S.C. § 2000e *et seq.*, against the Village of Calumet Park. Nagle also alleges violations of the First and Fourteenth Amendments through § 1983 against Mark Davis, Susan Rockett, Buster Porch, Melvin Davis and John Rigoni.

The defendants moved for summary judgment, and the district court granted the motion in part and denied it in part. Specifically, the district court denied the defendants' motion with respect to the retaliation claim for the February and April 2005 suspensions. The defendants moved for reconsideration of the court's decision, on the grounds that Chief Davis was not aware of the February EEOC charge at the time that he suspended Nagle, and Nagle never served the April 2005 suspension. Based on this information, the court granted the defendants' motion for reconsideration. Nagle appeals.

## II. ANALYSIS

We review a district court's decision granting summary judgment de novo. *Foskett v. Great Wolf Resorts, Inc.*, 518 F.3d 518, 522 (7th Cir. 2008). Summary judgment is appropriate where the evidence demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). All facts are construed and all inferences are drawn in favor of Nagle, who is the non-moving party. *See Foskett,* 518 F.3d at 522.

**A.  Summary judgment was appropriate on Nagle's race and age discrimination claims.**

   **1.   Nagle cannot establish a prima facie case under the direct method.**

Nagle claims that the defendants discriminated against him on the basis of his race and age by suspending him without pay in August 2004 and assigning him to less desirable job duties than younger, non-white employees at the same job level.[2] Nagle proceeds on his Title VII and ADEA claims under both the direct and indirect methods of proof.[3]

A plaintiff proceeding under the direct method survives summary judgment by creating triable issues as to whether discrimination motivated the adverse employment action of which he complains. *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008). Under the direct method, a plaintiff can establish discriminatory intent by relying on direct or circumstantial evidence. *Id.* "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 720 (7th Cir. 2005) (citing *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998)).

---

[2]  Many of the same adverse actions are relevant to both Nagle's discrimination and retaliation claims and are analyzed under both sections where appropriate.

[3]  We apply the same analytical framework to employment discrimination cases whether they are brought under the ADEA or Title VII. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 n.4 (7th Cir. 2003).

This evidence usually requires an admission from the decisionmaker about his discriminatory animus, which is rare indeed, but a plaintiff can also establish an inference of discrimination under the direct method by relying on circumstantial evidence such as:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007); *see also Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (stating that under the direct method, a plaintiff can establish discrimination under Title VII and the ADEA through circumstantial evidence "which suggests discrimination through a longer chain of inferences") (internal citation omitted). "Whether the plaintiff proceeding according to the direct method relies on direct evidence or circumstantial evidence, [he] can avoid summary judgment for the other party by 'creating a triable issue of whether the adverse employment action of which [he] complains had a discriminatory motivation.'" *Rudin*, 420 F.3d at 721 (citation omitted).

There is no admission from Chief Davis that he suspended Nagle or assigned Nagle to less desirable job

duties because of his race or his age. The defendants also point out that the discriminatory remarks upon which Nagle relies lack temporal proximity to the adverse employment actions of which Nagle complains. Nagle argues, however, that he is not relying exclusively on evidence of suspicious timing to establish discrimination under the direct method. Instead, he points to our decision in *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 666 (7th Cir. 2006), where we held that a district court "cannot view the record in small pieces that are mutually exclusive of each other," but must consider evidence of discriminatory remarks, despite being attenuated from the adverse employment action, in conjunction with all of the other evidence of discrimination to determine whether the plaintiff's claim can survive summary judgment. *See also Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006) ("A case of discrimination can likewise be made by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction.").

Therefore, Chief Davis's age and race-based comments, in some cases occurring months before or after the alleged discriminatory act and in others at unspecified times, can still be considered under the direct method. *See Paz*, 464 F.3d at 666 ("It is worth mentioning that the district court and [the defendant] were under the mistaken belief that [the plaintiff] cannot proceed under the direct method because some of [the defendant's] comments were made

two months prior to [the plaintiff's] firing. Yet, how recent the comments were, how extreme, and who made the remarks are pieces of evidence that inform whether there was a 'mosaic of discrimination.' ").

Comments can still be made at a time that is too distant from when the adverse action occurred to suggest that discrimination motivated the action. *See Conley v. Vill. of Bedford Park*, 215 F.3d 703, 711 (7th Cir. 2000) (finding that a comment made more than two years before the adverse employment action is too far removed to constitute evidence of discriminatory animus); *Hemsworth*, 476 F.3d at 491 (one year). Determinations must be made by considering all the facts, rather than by relying on a specific cut-off date by which comments must be made in order to support a finding of discriminatory intent. *Paz*, 464 F.3d at 666.

Here, we have Chief Davis's reference to Nagle and his peers as "those old white motherf—-ers" approximately fifteen times over a three-year period; his inquiry at an officer's August 2002 retirement party about Nagle's retirement plans; and his suggestion that Nagle was getting too old for the job when he allowed a prisoner to escape. Nagle argues that these comments have to be considered in conjunction with his arguments that: (1) Chief Davis has hired primarily younger, non-white officers since his tenure began, and (2) Chief Davis treats younger, non-white officers more favorably than older, white officers.

Nagle's conclusory statement that Chief Davis hired younger, non-white officers since his tenure began, without more, is insufficient to establish discriminatory intent

under the direct method. *See Yong-Qian Sun v. Bd. of Tr's.*, 473 F.3d 799, 813 (7th Cir. 2007) ("After all, [we have recognized] pattern evidence of disparate treatment 'whether or not rigorously statistical.' We do not hold, however, that a questionable pattern of promotion, standing alone, is sufficient evidence to withstand summary judgment.") (citation omitted). He provides no evidence, statistical or otherwise, to corroborate his belief that Chief Davis has hired primarily from these two demographics. In fact, in December 2002, Chief Davis appointed Susan Rockett, a 48-year-old white woman, as Assistant Chief of Police. Additionally, Chief Davis continued to hire older, white officers over the course of his tenure.

Nagle also points to various instances of differential treatment between older white officers and young, non-white officers. Nagle argues that white officers were assigned to strip mall detail at the Raceway Shopping Plaza and non-white officers were not assigned to this less-than-desirable job duty. Nagle also maintains that in October 2003, he was reassigned from patrol duty to the evidence locker. Nagle claims that this is an undesirable position because no one applied for it. Nagle also points to his assignment in March 2005 to be the department's senior liaison and his September 2005 assignment to strip mall detail as other incidents in which he was given less-than-desirable job duties.

Nagle has not shown that any of these assignments were adverse employment actions. "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Nichols v. S. Ill. Univ.*

*-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (citing *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)). As we have previously noted,

> for purposes of Title VII, there are three general categories of actionable, materially adverse employment actions: (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Id.* Neither the evidence locker, senior liaison, or strip mall duties involved a change in the terms or conditions of employment nor has Nagle shown that any of these positions significantly reduced his career prospects. *See Atanus*, 520 F.3d at 675 ("although the 'definition of an adverse employment action is generous,' an employee 'must show some quantitative or qualitative change in the terms or conditions of his employment' or some sort of 'real harm'") (citation omitted). In fact, Nagle admitted

that the senior liaison was a good program, that he enjoyed the position, and that he had received an earlier commendation for assisting an elderly Calumet Park resident.

The only indication that any of these positions are undesirable, other than a lack of applicants, is Nagle's contention that he didn't like "being stuck at the mall." But someone has to do it, and others have done it. Furthermore, Nagle has not shown that younger, non-white officers were assigned more "desirable" duties. His subjective impression about the desirability of these positions, without more, is insufficient to show discriminatory intent under the direct method. *See Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001) (noting that the plaintiff's personal belief carries no weight in summary judgment analysis).

Nagle also claims that younger, non-white officers are systematically treated better than white officers. He points to a February 2006 incident in which Mark Smith, a non-white officer under 40, shot an unarmed suspect while Smith was still on probationary status, but he was not placed on administrative leave. This evidence falls short of establishing discriminatory intent. Nagle does not point to any similar incidents involving white, older officers; he is not arguing that white officers who committed less severe actions were more severely disciplined; nor does he explain how Smith's situation compares to his own. *See Hemsworth*, 476 F.3d at 491-92 (finding no direct evidence of discrimination where 84% of the employees laid off by the defendant in 2001 were over the

age of forty because the plaintiff failed to show how these other employees compared to his situation).

Nagle also points to the removal of a white instructor by Commander Davis after two laterals, presumably young and/or non-white, failed the shooting qualification course. However, there is no comparative evidence that Nagle or any other white officer was disciplined for failing to pass the shooting qualification course, or that a non-white officer or one under 40 was not similarly removed from a supervisory position. *See id.*

The remaining incidents on which Nagle relies to try to show that younger, non-white officers were treated better are similar to the incidents in which he was disciplined and punished. In August 2004, Nagle was issued a three-day suspension for failing to assist Sergeant Rigoni with an arrest. Nagle maintains that Officer Vaughn, a non-white, "younger" officer who was also present, also failed to assist in the arrest, but unlike Nagle, he was not disciplined. There are, however, several issues that doom Nagle's claim.

Sergeant Rigoni, who recommended that Nagle be terminated and Vaughn not be disciplined for the incident, was not the final decision-maker. Chief Davis suspended Nagle based on a recommendation by Assistant Chief Rockett, who was also not a final decisionmaker but conducted an investigation into the incident. Although Assistant Chief Rockett and Sergeant Rigoni are both white and older, Nagle is arguing that both Rigoni or Rockett are conduits for Chief Davis's discriminatory animus because they "[do] anything and everything that the Chief tells [them] to do."

Nagle has not presented any evidence, direct or otherwise, that Assistant Chief Rockett has any bias against him directly, or that she was furthering Chief Davis's discriminatory animus by suspending him. *See Kormoczy v. Sec'y, United States Dep't of Hous. & Urban Dev. ex rel. Briggs*, 53 F.3d 821, 824 (7th Cir. 1995) ("Direct evidence is that which can be interpreted as an acknowledgment of the defendant's discriminatory intent."). After her investigation, Rockett determined that Nagle's behavior warranted suspension. Nagle questions the investigation, contending that it was a sham because Vaughn was not interviewed; however, Vaughn later filled out a report at Nagle's request indicating that Vaughn had taken part in the arrest, and that Nagle did not assist during the incident. Vaughn wrote in his report that Nagle said that he "did not want to have anything to do with this one" and did not enter the house. Nagle stood outside of the front screen door, and later called for an ambulance at Sergeant Rigoni's request, but that was the extent of his involvement. It is difficult to view Assistant Chief Rockett's investigation as being a "sham" when there is some validity to the allegations for which Nagle was ultimately suspended.

With regard to Sergeant Rigoni, Nagle testified in his deposition that Chief Davis's secretary, Linda Krezwicki, told Nagle that Chief Davis instructed Sergeant Rigoni to write Nagle up for "any and everything." However, Nagle has presented no evidence that Chief Davis's decision to suspend Nagle was in any way influenced by Sergeant Rigoni. *Cf. Ezell v. Potter*, 400 F.3d 1041, 1051 (7th Cir. 2005) (where employer relied on the advice of a

supervisor who was arguably motivated by race and gender bias, plaintiff survived summary judgment). In fact, Chief Davis *refused* to follow Sergeant Rigoni's recommendation to terminate Nagle for the incident, opting to suspend Nagle instead. Furthermore, the statement attributed to the Chief's secretary contains no reference to Nagle's race or age.

The August 2004 suspension also does not constitute direct evidence of discrimination under the ADEA because Nagle does not specify Officer Vaughn's age. He refers to him as a "younger, non-white officer," but it is clear from the record that Officer Vaughn has been a police officer with Calumet Park since 1982 so it is likely that his age is comparable to Nagle's age. In any event, it is Nagle's burden to establish that his comparator is "substantially younger" than he for purposes of the ADEA. *See Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321 (7th Cir. 2003). We have described " 'substantially younger' as generally ten years younger," *id.* at 322, and this threshold is not met here by simply referring to the comparator as being "younger" than the plaintiff.

Next, Nagle maintains that his May 24, 2004, reprimand for allowing a prisoner to escape with handcuffs on is comparable to the situation of Officer Mario Smith (to be distinguished from Officer Mark Smith discussed above), who was not disciplined after he allowed a prisoner he arrested to escape from the back of the car. This argument must also fail. Similar to Officer Vaughn, Nagle refers to Mario Smith as "younger," and this comparison fails for the same reason. Under the direct method, the inference that the employer acted based on the prohibited

animus has to be substantially strong. *Rudin*, 420 F.3d at 721. The fact that the incident involved differential treatment between two older officers would certainly require a much longer chain of inferences in order to conclude that discrimination was the reason for this action. Here, the chain is too long, and we find that Nagle cannot prevail on his claims based on the direct method.

Given Nagle's uncompelling comparative evidence, all that we are left with are Chief Davis's discriminatory remarks which, given that these comments were not made in the same temporal proximity as the allegedly discriminatory acts, are insufficient to establish discrimination under the direct method. Accordingly, Nagle has not established a prima facie case of discrimination under the direct method.

###     2.    Nagle cannot survive summary judgment under the indirect method.

Under the indirect method, a plaintiff must show that he is a member of a protected class; he was meeting his employer's legitimate performance expectations; he suffered an adverse employment action; and he was treated less favorably than similarly situated individuals who are not white or over 40. *Ineichen v. Ameritech*, 410 F.3d 956, 959 (7th Cir. 2005). With regard to Nagle's race discrimination claim, where members of the majority group believe that they have been subjected to discrimination, rather than showing that they are members of a protected class, they must show "'background circumstances' that demonstrate that a particular employer has 'reason or inclination to discriminate invidiously

against whites' or evidence that 'there is something 'fishy' about the facts at hand.'" *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003) (quoting *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 455 (7th Cir. 1999)).

While Chief Davis and Commander Davis's discriminatory comments might be sufficient to establish the requisite background circumstances, Nagle cannot establish a prima facie case of discrimination because, as discussed above, he cannot show that similarly situated individuals were treated better. Furthermore, the reassignments do not constitute adverse actions. Accordingly, we find that summary judgment was appropriate on Nagle's age and race discrimination claims.

## B. Summary judgment was appropriate on Nagle's retaliation claim.

Nagle filed EEOC charges on January 19, 2005, February 23, 2005, and May 9, 2005. He contends that the defendants retaliated against him for filing these charges by: suspending him for three days on February 11, 2005; assigning him to the senior liaison position in March 2005; suspending him for five days on April 23, 2005; changing his court key date on May 10, 2005; and assigning him to strip mall detail on September 9, 2005. Nagle proceeds under both the direct and the indirect methods to establish his retaliation claim. Although Title VII's antiretaliation provisions are not limited to "ultimate employment decisions," *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 67 (2006), Nagle must show that the actions of which he complains were "materially adverse" and

produced "an injury or harm" that would have "'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 67-68. Some of the actions which Nagle claims were retaliatory do not meet this threshold. Moreover, Nagle cannot establish that Chief Davis knew about his January 2005 EEOC charge prior to suspending him in February 2005, so his retaliation claim fails.

### 1. Nagle's assignments to various positions do not constitute materially adverse actions.

Nagle maintains that his assignments to the senior liaison position and to strip mall detail were both adverse actions in retaliation for his complaints of discrimination. While Nagle's assignment to the senior liaison position or strip mall detail did not involve any change in his pay, hours, or prospects for advancement within the department, the test is an objective one that considers "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.''" *Id.* at 71 (citation omitted).

While one can imagine situations in which reassignment to less desirable details or positions would dissuade a reasonable worker from making a charge of discrimination, here the senior liaison position was posted for other officers to apply, and after no one applied, Nagle was assigned to the position. This fact arguably cuts both ways: the senior liaison position had to be filled by some-

one and an employer is entitled to fill the position. In the alternative, an employer is not entitled to be punitive in his assignments—he cannot assign an employee to a less favored position because that employee has exercised his statutory rights. Nagle has offered no evidence that his assignment to the senior liaison position was punitive—the senior liaison position continued to exist after Nagle was reassigned, and another officer was assigned to take his place after his tenure ended. The same is true of strip mall detail—both white and non-white officers worked this duty. Nagle claims that he faced discipline if he refused to work the strip mall detail whereas other officers "are ordered to work it, and they don't and nothing happens to them," but this statement is wholly unsupported by the record. Nagle has not pointed to any evidence to support his claim that others were not punished for refusing to work strip mall detail.

The change in Nagle's court key date is also not materially adverse. Nagle maintains that this disruption rises to the level of an adverse action because he has had the same court key date for 27 years and an officer's schedule is adjusted around this date. As we have cautioned in the past, a materially adverse change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). While disruptive in that the change altered the date on which Nagle had to attend court, the change did not have a tangible impact on his job responsibilities or benefits, nor did it require that he attend court any more than usual.

In April 2005, Nagle was suspended for violating the department's sick time policy, and he alleges that this suspension was in retaliation for both his January 19, 2005, and February 23, 2005, EEOC charges. It is undisputed that a suspension can constitute an adverse action. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005). Although Nagle filed a grievance regarding this suspension, he never served the suspension because the grievance was resolved in his favor.

We have explicitly held that "a suspension without pay that is never served does not constitute an adverse employment action." *Id* at 647. While Nagle admits that he never served the suspension, he argues that the April 2005 suspension should constitute an adverse action because he was faced with the prospect that the suspension would be upheld upon resolution of his grievance. *Cf. Burlington Northern*, 548 U.S. at 72 (finding retaliation even where the plaintiff received back pay because the plaintiff and her family "had to live for 37 days without income. They did not know during that time whether or when [the plaintiff] could return to work. Many reasonable employees would find a month without a paycheck to be a serious hardship. And [the plaintiff] described to the jury the physical and emotional hardship that 37 days of having 'no income, no money' in fact caused."). Unlike the plaintiff in *Burlington Northern*, however, Nagle did not suffer any hardship connected with the suspension because he never actually served it. Uncertainty as to whether the suspension will be upheld is not equivalent to actually serving the suspension because the plaintiff does not have to

endure the same economic harm. *See Whittaker,* 424 F.3d at 647 ("Typically, adverse employment actions are economic injuries."); *see also Ajayi v. Aramark Bus. Servs.,* 336 F.3d 520, 531 (7th Cir. 2003) ("An unfulfilled threat, which results in no material harm, is not materially adverse."). Therefore, we find that the April 2005 suspension which Nagle never served does not constitute an adverse action. Accordingly, none of these actions would deter a reasonable employee from filing a complaint of discrimination.[4]

### 2. Nagle's retaliation claim also fails.

---

[4] There is also an issue whether Nagle's allegations regarding his court key date and his reassignment to strip mall duty are time-barred. Nagle filed his last EEOC charge on May 9, 2005, and he did not file a subsequent charge regarding the May 10, 2005 change in his court key date or his September 5, 2005 reassignment. "In Illinois, a complainant must file a charge with the EEOC within 300 days of the alleged discriminatory act and failure to do so renders the charge untimely." *Filipovic v. K & R Express Sys., Inc.,* 176 F.3d 390, 395 (7th Cir. 1999). One exception to this rule, the continuing violation doctrine, would allow a court to consider acts that occurred outside of the limitations period if " 'related closely enough' to the acts occurring within the established time frame 'to be considered one ongoing violation.' " *Id.* at 396. It is not clear if the doctrine would extend to cover incidents that occurred *after* the complainant has filed an EEOC charge. *See Ledbetter v. Goodyear Tire & Rubber Co.,* 127 S. Ct. 2162 (2007) (holding that the time for filing an EEOC charge alleging a discriminatory act begins when that act occurs and the clock restarts for each discrete act of discrimination). In any event, because these allegations do not amount to an adverse action, we need not resolve this issue.

We are left with Nagle's February 2005 suspension for conducting union business while on duty. Nagle filed a grievance regarding this suspension, and the Illinois Labor Relations Board reversed the suspension and ordered the police department to reimburse Nagle for his losses. The February 2005 suspension presents a different issue because unlike the April 2005 suspension, Nagle served the suspension and lost pay. Although Nagle's suspension was ultimately found to be improper, a reasonable jury still could find that having to serve the suspension would dissuade a reasonable employee from making or supporting a charge of discrimination. *See Burlington Northern*, 548 U.S. at 73. After all, no one knew whether the suspension would be reversed or upheld, and reimbursement of lost pay is not sufficient to defeat Nagle's Title VII retaliation claim. *See Phelan v. Cook County*, 463 F.3d 773, 780 (7th Cir. 2006) ("Consistent with Title VII's goal of deterring discrimination, we decline to endorse a rule that would allow employers to escape liability by merely reinstating the aggrieved employee months after termination, whenever it becomes clear that the employee intends to pursue her claims in court. Such a rule could create an unintended economic incentive for employers to reinstate an employee who files a discrimination suit as means to avoid Title VII penalties whenever the costs of reinstating the employee are lower than the employer's exposure in a Title VII suit.").

Nonetheless, Nagle has failed to show that there is a causal connection between the suspension and his

statutorily protected activity sufficient to defeat summary judgment. *Lewis v. City of Chicago*, 496 F.3d 645, 655 (7th Cir. 2007). Nagle filed EEOC charges on January 19, 2005, but Nagle has not shown that Chief Davis was aware that he filed a grievance in February 2005. This dooms his claim not only under the direct method, but also under the indirect method. *See Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 888 (7th Cir. 2004) ("Under the direct method, the plaintiff must provide either direct evidence or circumstantial evidence that shows that the employer acted based on prohibited animus."); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668-69 (7th Cir. 2006) ("[P]roof of retaliation under the indirect method presupposes that the decision-maker knew that the plaintiff engaged in a statutorily protected activity, because if an employer did not know the plaintiff made any complaints, it 'cannot be trying to penalize him for making them.'") (citation omitted).

The EEOC charge was mailed to the department on January 27, 2005, and the correspondence indicated that it should be given to "Chief David" rather than Chief Davis. Additionally, the envelope was addressed to "Personnel Manager, Human Resources Department, Village of Calumet Park." The district court surmised from this evidence that no jury could reasonably conclude that Chief Davis was aware of the EEOC charge at the time of the February 2005 suspension. We agree.

In order to establish retaliation pursuant to Title VII, the employer must have had actual knowledge of the protected activity in order for its decisions to be

retaliatory; it is not sufficient that "[an employer] could or even should have known about [an employee's] complaint." *Tomanovich*, 457 F.3d at 668. While the EEOC notice conceivably could have sat in the personnel department for two weeks, it is also possible that the personnel manager surmised that "Chief David" was in fact "Chief Davis" and passed on the notice to him in a timely fashion, but Nagle has presented no evidence showing this to be the case. Moreover, on January 25, 2005, Chief Davis ordered Nagle to prepare a memo regarding his actions in conducting union business while on duty, sent Nagle a memo indicating Davis's belief that Nagle had violated department rules, and requested Nagle's explanation before issuing discipline. All of this occurred prior to when the EEOC sent Nagle's charge to the department, which occurred on January 27, 2005. We find that Nagle has presented no evidence to show that Chief Davis was aware of the EEOC charge at the time of the February 2005 suspension.[5] Accordingly, Nagle has not established that the defendants retaliated against him in violation of Title VII.

## C. Nagle's First Amendment retaliation claim fails.

Nagle contends that the defendants retaliated against him for comments that he made at a May 12, 2004, Labor

---

[5] Even if Nagle could establish a prima facie case of retaliation for the February 2005 suspension, he concedes that he was in fact conducting union business during his lunch, which is considered on-duty time and a violation of department policy.

Management Meeting that he attended in his capacity as the union safety and grievance officer. This meeting consisted of a small group of union and management representatives including Chief Davis and other Calumet Park police officers. The focus of this meeting was the reduction of the number of officers during certain shifts, and concerns were raised by attendees that manpower reductions would impact police safety. Nagle claims that, the day after the meeting, Chief Davis warned Nagle that if he ever spoke to Chief Davis in the manner in which Nagle did at the Labor Management Meeting, he would be disciplined. Following this warning, Chief Davis suspended Nagle for two days for violating the sickday policy. Nagle alleges that the suspension was in retaliation for statements he made at the Labor Management Meeting. Nagle also maintains that his May 24, 2004, reprimand for allowing a prisoner to escape with handcuffs on and his August 2004 suspension for failing to assist another officer were in retaliation for his earlier statements at the Labor Management meeting.

"To make out a prima facie case of first amendment retaliation, a public employee must present evidence that: (1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter free speech, and (3) his speech was at least a motivating factor in the employer's action." *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (citations omitted). Under the first prong, speech is constitutionally protected if "(1) the employee spoke as a citizen on matters of public concern, and (2) the interest of the employee as a citizen in commenting upon matters of public concern outweighs the interest of the

State as an employer in promoting the efficiency of the public services it performs through its employees." *Sigsworth v. City of Aurora*, 487 F.3d 506, 509 (7th Cir. 2007).

In *Garcetti v. Ceballos,* 547 U.S. 410, 421 (2006), the Supreme Court held that speech made pursuant to a person's official responsibilities does not receive First Amendment protection. *See also Spiegla,* 481 F.3d at 965 ("*Garcetti* made clear that public employees speaking 'pursuant to their official duties' are speaking as employees, not citizens, and thus are not protected by the First Amendment regardless of the content of their speech."); *Vose v. Kliment*, 506 F.3d 565, 570 (7th Cir. 2007).

Nagle argues that because he was speaking in his capacity as a union official, his comments were made as a citizen rather than as a public employee. In *Fuerst v. Clarke*, 454 F.3d 770, 774 (7th Cir. 2006), we held that *Garcetti* did not control where a deputy sheriff made constitutionally protected statements in his capacity as a union representative. Similarly, Nagle was speaking in his capacity as a union representative and *Garcetti* does not deprive his comments of First Amendment protection.

Nonetheless, Nagle's claim fails because he has not shown that he engaged in constitutionally protected speech. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). In analyzing the "content, form, and context of a given statement" to determine if the statements are constitutionally protected, "we have stressed that content is

the most important." *Kokkinis v. Ivkovich*, 185 F.3d 840, 848 (7th Cir. 1999). According to Nagle, his statements addressed "the manpower and the police safety on the street as far as the community and as far as the officers" and "the reduction of cops on the street, as far as safety for the residents and businesses."

Nagle does not identify any specific statements that were made at the meeting. While his statements regarding police manpower could, as a general matter, be of public concern, the subject matter alone does not convey constitutional protection to his statements. *See Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 410 (7th Cir. 1994) ("the fact that an employee speaks up on a topic that may be deemed one of public import does not automatically render [his] remarks on that subject protected") (quotation omitted); *Hartman v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 4 F.3d 465, 471 (7th Cir. 1993) (finding that whether speech is of public concern does not turn on the general subject matter of the employee's speech); *Colburn v. Trs. of Indiana Univ.*, 973 F.2d 581, 586 (7th Cir. 1992) ("the fact that the issue could be 'interesting' to the community does not make it an issue of public concern"). "We must instead delve deeper into the precise content, form, and context of speech that admittedly may be of some interest to the public." *Cliff*, 42 F.3d at 410 (citing *Connick*, 461 U.S. at 147-48).

Here, the content or form of the statements made by Nagle at the Labor Management meeting is unclear from the record, nor is it apparent how these statements, whatever they may be, relate either to his job as a police

officer, his status as a citizen, or his capacity as a union representative. At his deposition, when asked by his attorney "what was said by whom" at the Labor Management meeting, Nagle testified that: "It was a discussion amongst everybody in regards to different things and how manpower was reduced and was going to be reduced at different times of the year." Nagle did not provide any details about the statements he made at the meeting, stating only that "It's just that I remember that's what the meeting was about." *See Brooks,* 406 F.3d 476, 479-80. Not only is it unclear which of Nagle's statements could constitute protected speech, the context in which the comments were made is also unclear. Accordingly, summary judgment was appropriate on Nagle's First Amendment Retaliation claim.[6]

### III. CONCLUSION

The judgment of the district court is AFFIRMED.

---

[6] In his brief, Nagle also asserts that the individual defendants violated his Fourteenth Amendment rights, but there is no discussion of this claim in the district court's decision nor does Nagle discuss it in his brief. Therefore, Nagle has waived this argument. *See Salas v. Wis. Dep't of Corr.,* 493 F.3d 913, 924 (7th Cir. 2007).