**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN ELLINS,
                    *Plaintiff-Appellant*,

v.

CITY OF SIERRA MADRE, A
Municipality; MARILYN DIAZ,
Individually and as Chief of Police,
                    *Defendants-Appellees*.

No. 11-55213

D.C. No.
2:09-cv-03971-
CBM-RZ

OPINION

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, Senior District Judge, Presiding

Argued and Submitted
May 8, 2012—Pasadena, California

Filed March 22, 2013

Before: Kim McLane Wardlaw, Richard A. Paez, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Wardlaw;
Concurrence by Judge Rawlinson

## SUMMARY[*]

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment and remanded in this 42 U.S.C. § 1983 action brought by a police officer who alleged that his salary increase was delayed in retaliation for the exercise of his First Amendment rights.

The panel held that: (1) plaintiff's speech, which involved leading a no-confidence vote of the police officers' union against the Chief of Police, involved a matter of public concern; (2) a jury could reasonably conclude that plaintiff's union activities and related speech were undertaken in his capacity as a private citizen; (3) the delay in plaintiff's pay increase constituted an adverse employment action; (4) plaintiff's speech was a substantial or motivating factor for the delay; and (5) the Chief of Police was not entitled to qualified immunity for causing the delay. The panel further held that the City of Sierra Madre was not liable for the allegedly retaliatory conduct under a *Monell* theory of liability.

Concurring in the judgment, Judge Rawlinson agreed that the case should be remanded. She declined to join the majority's discussion of whether plaintiff established a First Amendment claim, and its conclusion that he spoke in his capacity as a private citizen, stating that those issues should be resolved on remand by the factfinder.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Michael A. Morguess, and Carolina V. Diaz, Lackie, Dammeier & McGill, APC, Upland, California, for Plaintiff-Appellant.

Elizabeth M. Kessel and Scott E. Boyer, Kessel & Associates, Los Angeles, California, for Defendants-Appellees.

**OPINION**

WARDLAW, Circuit Judge:

John Ellins, a police officer for the City of Sierra Madre, led a no-confidence vote of the police officers' union against the Chief of Police, Marilyn Diaz. Diaz subsequently delayed signing an application for a certification that, when issued, would have entitled Ellins to a five percent salary increase. Ellins brought suit under 42 U.S.C. § 1983 against Diaz and the City of Sierra Madre (collectively, "Defendants"), alleging that Diaz's delay was unconstitutional retaliation for the exercise of his First Amendment rights. The district court granted summary judgment in favor of Defendants, concluding that Ellins had failed to meet his burden under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), to show that he undertook his act as a private citizen and not pursuant to his official duties. We disagree, and further hold that Ellins has established a prima facie case of First Amendment retaliation. We thus reverse the grant of summary judgment in favor of Diaz and remand for further proceedings. We affirm the district court's grant of summary judgment to the City of Sierra Madre because Ellins did not adduce sufficient evidence to defeat

summary judgment on his *Monell* claim. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

## I.

Ellins served as President of the Sierra Madre Police Association (SMPA) from late 2006 to January 2010. According to the Memorandum of Understanding (MOU) between the City and the SMPA, the SMPA is the recognized employee's organization for all classified employees of the Sierra Madre Police Department except the Chief of Police and the Lieutenant. The SMPA's bylaws provide that "[t]he President shall be the executive officer of the Association and, subject to the control of the membership, shall have general supervision, direction and control of the affairs of the Association. He/She shall preside at meetings of its members."

Early in Ellins's tenure as SMPA president, Chief Diaz instituted "two-on-two" meetings with the SMPA, designed to "facilitate open communication" and resolve issues between the Department and the SMPA before they became grievances or lawsuits. According to Diaz, Ellins occasionally expressed disagreement with her decisions, but the tone of the meetings was generally "very cordial." At some point Ellins stopped attending the two-on-twos. Thereafter, Diaz learned of grievances and lawsuits filed by the SMPA against the City, as well as two SMPA press releases critical of her leadership. One of the press releases announced a vote of no confidence taken against Diaz by the SMPA membership.

Ellins led the SMPA in the vote of no confidence in 2008. According to Ellins, the union membership initiated the vote

because of Diaz's "lack of leadership, wasting of citizens' tax dollars, hypocrisy, expensive paranoia, and damaging inability to conduct her job." SMPA conducted the vote by secret ballot, and 100% of its membership voted. Ellins testified that he led the vote because "as President [of the SMPA], you would have to lead the vote of no confidence." The SMPA then issued the two press releases that Diaz read: one about the vote, and another that criticized Diaz's management style. The press release about the vote listed examples of Diaz's purported incompetence and lack of leadership, including allegations that she wasted taxpayers' money, fell asleep at City Council and other meetings, violated the MOU between the city and the SMPA, and generally harassed her employees.

Diaz testified that when she learned of the SMPA "no confidence" press release she felt "disappointment" and "disbelief that this could have occurred." After the second SMPA press release issued, she felt "disappointed and disheartened that the [SMPA] had chosen what I thought was a counter-productive action." She also testified that she was "disappointed" in Ellins, as SMPA president, for what she presumed was his involvement in the press releases. She expressed this disappointment to her captain and to several members of the police department.

At the time of the no-confidence vote, Ellins had been the subject of three internal affairs investigations.[1] In November

---

[1] In his opening brief, Ellins also contends that the three internal and one criminal investigations of him were also retaliatory. However, the district court held that because Ellins did not include this claim in the pretrial order, Ellins failed to preserve it for trial. Ellins does not appeal this ruling, and so has waived any argument to the contrary. *See*

2006, he was investigated for associating with a convicted narcotics offender and attempting to dissuade a sergeant from issuing a parking ticket to the ex-convict. He received a 125-hour suspension without pay for this incident, which he did not serve. In August 2008, Ellins was investigated for not citing or arresting a theft suspect in whose car Ellins had found marijuana. In May 2008, he was investigated for telling the City Finance Director that residents who did not want to be evacuated during a serious wildfire near Sierra Madre were "stupid" and "deserved to die." Ellins received a reprimand for this statement in December 2008. Finally, in October 2008, Diaz initiated a criminal investigation by the Los Angeles County District Attorney's office into Ellins's alleged misconduct. She provided the District Attorney's office with information about Ellins's alleged sales and use of anabolic steroids, assault with his duty weapons, and other matters "relating to sexual misconduct while on duty." Diaz says she received the information about the alleged misconduct from "another Police Chief." No charges resulted from the District Attorney's criminal investigation of Ellins's alleged misconduct.

On February 29, 2009, Ellins submitted an application to Diaz for an Advanced Peace Officer Standards and Training (P.O.S.T.) certificate. The application for certification required a signature from a "Department Head" or "Authorized Designee." In a paragraph above the signature line, the application reads, "Recommendation to Award Certificate: In my opinion, the applicant is of good moral

---

*Greenwood v. F.A.A.*, 28 F.3d 971, 977–78 (9th Cir. 1994). Upon remand, he may seek leave of the district court to amend the pretrial order to include these additional alleged retaliatory actions in his claim.

character and worthy of the award(s), based on personal knowledge." Under the MOU between the City and the SMPA, Ellins would receive a five percent pay raise if he received an Advanced P.O.S.T. certificate. While Ellins's P.O.S.T. application was pending before Diaz, Ellins served his suspension for the August 2008 incident, from May 3 to June 3, 2009.

Diaz testified that when Ellins submitted the application to her, she did not immediately sign it because of her concern that Ellins lacked the requisite good moral character. Diaz consulted with seven other people regarding her decision against signing Ellins's P.O.S.T. application, all of whom agreed with her decision.[2] Diaz had not delayed signing any of the four other P.O.S.T. applications from other officers that she had previously signed. However, unlike Ellins, none of the prior applicants had ever received discipline more severe than a written warning.

On June 3, 2009, with his application for a P.O.S.T. certificate still unsigned, Ellins filed this lawsuit in the United States District Court for the Central District of California seeking damages and injunctive relief, based on alleged retaliation for his exercise of individual civil rights, free expression and association, and labor, social, and political activities. Ellins contends that Diaz retaliated against him by delaying the approval of the P.O.S.T. application out of anger

---

[2] According to Diaz's deposition testimony, the individuals she consulted included a "P.O.S.T. senior training consultant" for the State of California, the former police chief of the Anaheim Police Department, a current lieutenant in the Anaheim police, an expert in police ethics, and Diaz's "boss," the city manager of Sierra Madre, Elaine Aguilar.

because of "[his] outspokenness, the vote of no confidence, and [his] union activities." He also alleged a *Monell* claim against the City.

On September 14, 2010, Diaz and the City moved for summary judgment. In support of the motion, Diaz declared that she learned that the District Attorney would not file criminal charges against Ellins in October 2009. Two months later, although she had not received written confirmation of this fact from the District Attorney's office, on December 3, 2009, Diaz signed Ellins's P.O.S.T. application "rather than delay the process any longer." Diaz also declared that "because [Ellins] had commenced this litigation, it was hoped that if he was given a retroactive pay raise to the date he filed this lawsuit . . . he would forego [sic] this litigation." The P.O.S.T. Commission issued the certificate on December 7, 2009, and Ellins was given the five percent pay raise retroactive to June 3, 2009, the date on which he both returned from the 160-hour suspension and filed this lawsuit.

On January 5, 2011, the district court granted Defendants' motion for summary judgment on the ground that Ellins had not satisfied his burden of establishing a prima facie claim of First Amendment retaliation. The district court further held that Diaz, individually, was entitled to qualified immunity, and that the City did not bear *Monell* liability. *See Monell*, 436 U.S. 658.

## II.

We review a grant of summary judgment de novo. *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 747 (9th Cir. 2010). We also review de novo the district court's

decision to grant summary judgment on the basis of qualified immunity. *Davis v. City of Las Vegas*, 478 F.3d 1048, 1053 (9th Cir. 2007). We must determine whether, viewing the evidence in the light most favorable to Ellins, "there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Delia v. City of Rialto*, 621 F.3d 1069, 1074 (9th Cir. 2010) (internal quotation marks and citation omitted), *rev'd on other grounds*, *Filarsky v. Delia*, 132 S. Ct. 1657 (2012).

## III.

"The First Amendment shields a public employee if he speaks as a citizen on a matter of public concern." *Anthoine*, 605 F.3d at 748 (internal quotation marks omitted). However, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.

We follow a sequential five-step inquiry to determine whether an employer impermissibly retaliated against an employee for engaging in protected speech. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). "First, the plaintiff bears the burden of showing: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; and (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action." *Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009) (internal quotation marks and citation omitted). "Next, if the plaintiff has satisfied the first three steps, the burden shifts to the government to show:

(4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech." *Id*.

The district court granted summary judgment for Diaz on the ground that Ellins had not satisfied his prima facie burden. Specifically, the district court held that Ellins failed to establish that (1) he spoke as a private citizen in leading the no-confidence vote; (2) he suffered an adverse employment action; and (3) his protected act was a substantial or motivating factor in the alleged adverse employment action.

## A.

Diaz first argues that Ellins cannot establish a First Amendment retaliation claim because the no-confidence vote did not involve a matter of public concern.[3] "Speech involves

---

[3] Diaz makes this argument for the first time on appeal. It was not raised before the district court, either in the motion for summary judgment or at the hearing, and the district court's order accordingly does not address it. "Absent exceptional circumstances, we generally will not consider arguments raised for the first time on appeal, although we have the discretion to do so." *Baccei v. United States*, 632 F.3d 1140, 1149 (9th Cir. 2011). This discretion is normally limited to matters of pure law. *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992–93 (9th Cir. 2010). Here, we reach the issue because it is a matter of pure law, *see Eng*, 552 F.3d at 1070, and it is closely linked to the "private citizen" inquiry we must undertake to determine whether the second element of a First Amendment retaliation claim has been satisfied. *See Connick v. Myers,* 461 U.S. 138, 143 (1983) (noting the "repeated emphasis in *Pickering* [*v. Bd. of Educ.*, 391 U.S. 563 (1968)] on the right of a public employee 'as a citizen, in commenting upon matters of public concern'").

a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). Speech that deals with "individual personnel disputes and grievances" that "would be of no relevance to the public's evaluation of the performance of governmental agencies" generally is not of public concern. *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48 (1983).

Diaz's public concern argument relies heavily on *Connick*, in which the Supreme Court concluded that most of an office questionnaire circulated by an assistant district attorney, who had been transferred against her wishes, was not a matter of public concern. The questionnaire concerned "office transfer policy, office morale," and "the level of confidence in supervisors." *Id.* at 141. The Court reasoned that these issues were "mere extensions of Myers' dispute over her transfer to another section of the criminal court." *Id*. at 148. Diaz argues that Ellins himself characterizes the grievances motivating the no-confidence vote as matters involving the MOU, scheduling dispatchers, searching officers' lockers, and other internal issues. Diaz contends that these matters are mere "personnel grievances," and that the vote and attendant press releases were therefore an extension of the dispute between the police officers and the department, rather than speech about a matter of public concern. We disagree.

The record tends to belie Diaz's characterization of the reasons behind the no-confidence vote. Ellins stated in his declaration that he led the vote "due to Chief Diaz's lack of leadership, wasting of citizens' tax dollars, hypocrisy, expensive paranoia, and damaging inability to conduct her job." Ellins echoed that contention in his deposition testimony, asserting that the no-confidence vote stemmed from "how upset members [of the union] were on how Chief Diaz conducted herself as a Chief."

Diaz also misconstrues the rationale behind *Connick*. The dispositive fact in *Connick* was not that the vote resulted from a personnel grievance, but rather that it resulted from an *individual* personnel grievance. Our precedent instructs that *collective* personnel grievances raised by unions may be matters of public concern. *See Lambert v. Richard*, 59 F.3d 134, 136–37 (9th Cir. 1995) (holding that where library employee told City Council that library was mismanaged and that employees were "devoid of zest," the speech was on a matter of public concern because she "spoke as a union representative, not as an individual, and . . . she described departmental problems, not private grievances").

That was also the upshot of our decision in *McKinley*, which involved a union representative police officer who discussed police salaries at a city council meeting and in a television interview. 705 F.2d at 1112. We held that the subject matter of his speech was a matter of public concern because salaries—the subject of the classic personnel grievance—affect the city's ability to attract and retain qualified police personnel, and "the competency of the police force is surely a matter of great public concern." *Id*. at 1114. Because the officer in *McKinley* spoke as a union

representative and expressed the concerns of the police union as a whole, the issue became a matter of public concern. Other courts have made this point expressly. *See Fuerst v. Clarke*, 454 F.3d 770, 774 (7th Cir. 2006) (holding that comments made by deputy sheriff as president of sheriffs' union were "prima facie protected by the First Amendment as a contribution to political debate"); *see also Boddie v. City of Columbus*, 989 F.2d 745, 750 (5th Cir. 1993) ("[S]peech in the context of union activity will seldom be personal; most often it will be political speech.").

Here, Ellins led a no-confidence vote about Diaz by the police officers' union. Diaz does not contend that any of the grievances motivating the vote were individual as opposed to collective. Instead, as in *Lambert*, the record suggests that the police union's concerns were with Diaz's leadership style and other department-wide problems, not private grievances. *See Lambert*, 59 F.3d at 137. Further, as in *McKinley*, these departmental problems were of inherent interest to the public because they could affect the ability of the Sierra Madre police force to attract and retain officers. *See McKinley*, 705 F.2d at 1114. Viewing the facts in the light most favorable to Ellins, his speech in connection with the SMPA's no-confidence vote involved a matter of public concern. Therefore, he introduced sufficient evidence to create a genuine issue of material fact as to the first element of a First Amendment retaliation claim.

**B.**

Ellins must also demonstrate that the speech in question "was spoken in the capacity of a private citizen and not a public employee." *Eng*, 552 F.3d at 1071. The district court determined that Ellins failed to present sufficient evidence to

establish that in leading the no-confidence vote he spoke as a private citizen, rather than pursuant to his official duties as a police officer. Ellins contends that the district court erred because his official duties as a police officer did not require him to serve as president of the union or to engage in union activities, much less to lead votes of no-confidence. We agree that, in light of the record evidence, a jury could find that Ellins spoke in his capacity as a private citizen.

We have held that a public employee speaks as a private citizen "if the speaker 'had no official duty' to make the questioned statements, or if the speech was not the product of 'performing the tasks the employee was paid to perform.'" *Id.* (citation omitted). "While the question of the scope and content of a plaintiff's job responsibilities is a question of fact, the ultimate constitutional significance of the facts as found is a question of law." *Id.* (internal quotation marks and citation omitted); *see also Eng*, 552 F.3d at 1071 ("the question of the scope and content of a plaintiff's job responsibilities is a question of fact"); *Robinson v. York*, 566 F.3d 817, 823 (9th Cir. 2009) ("The scope of Robinson's job duties is a question of fact"); *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008) ("Because the task of determining the scope of a plaintiff's job responsibilities is concrete and practical rather than abstract and formal, we are confident that a factual determination of a plaintiff's job responsibilities will not encroach upon the court's prerogative to interpret and apply the relevant legal rules.").

The distinction drawn in our First Amendment jurisprudence between private and official speech is rooted in the Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). There, a defense attorney asked a

deputy district attorney, Ceballos, to investigate a police officer's affidavit in support of a search warrant underlying a prosecution. Such requests were not uncommon. Concluding that the police officer's affidavit contained serious misrepresentations, Ceballos wrote a memorandum to his supervisor recommending dismissal of the prosecution because the evidence supporting it was the product of a defective affidavit. Soon afterward, Ceballos was reassigned from his calendar deputy position to a trial deputy position, transferred to another courthouse, and denied a promotion. *Id*. at 414. He filed a § 1983 action alleging retaliation for his speech. The Court determined that in recommending dismissal, Ceballos had simply fulfilled his professional duties and therefore his speech was not protected from retaliation by the First Amendment. The Court reasoned that

> The controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy. That consideration— the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case—distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline. We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.

*Id*. at 421 (internal citation omitted). Ceballos' retaliation claim failed because he was not acting as a private citizen when he went about his "daily professional activities"; instead, "[w]hen he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee." *Id*. at 422.

Ellins introduced evidence that he led the no-confidence vote and issued the related press releases in his capacity as a union representative.[4]  Ellins's daily professional duties as a police officer did not include acting as a union representative or serving as the President of the SMPA.  Therefore, the district court erred when it concluded as a matter of law that Ellins acted in his capacity as a public employee when he led the no-confidence vote.  There was sufficient evidence to suggest that this was not a task he was paid to perform. Therefore, a jury could reasonably conclude that Ellins's union activities and related speech were undertaken in his capacity as a private citizen.

As the Seventh Circuit has recently held, comments made by a police officer acting in his capacity as a union representative are spoken as a private citizen, rather than pursuant to the officer's official duties. *Fuerst v. Clarke*, 454 F.3d 770 (7th Cir. 2006).  In *Fuerst*, the plaintiff, a deputy sheriff who also served as the president of the Milwaukee County deputy sheriffs' union, publicly criticized the county sheriff's proposal to hire a civilian to fill a position

---

[4] Ellins testified that the press releases were made public through the SMPA's legal representatives.  In her deposition testimony, Diaz acknowledged that she thought that Ellins was "behind" the press releases.

traditionally occupied by a deputy sheriff. *Id.* at 772. In determining whether the sheriff was justified in retaliating against Fuerst, the Seventh Circuit dismissed the notion that Fuerst spoke as a public employee under *Garcetti* when he criticized the proposal:

> Because Fuerst's comments that precipitated the adverse action taken against him were made in his capacity as a union representative, rather than in the course of his employment as a deputy sheriff—his duties as deputy sheriff did not include commenting on the sheriff's decision to hire a public-relations officer—the Supreme Court's recent decision in *Garcetti v. Ceballos* is inapposite.

*Id.* at 774 (citation omitted); *see also Baumann v. District of Columbia*, 744 F. Supp. 2d 216, 224 (D.D.C. 2010) (holding that police officer's criticism of his department's handling of a sniper incident was protected speech because the officer spoke in his capacity as police union president); *Hawkins v. Boone*, 786 F. Supp. 2d. 328, 335 (D.D.C. 2011) (holding that detective's statements critical of a departmental staffing initiative were protected by the First Amendment because the detective spoke as a police union representative).

Given the inherent institutional conflict of interest between an employer and its employees' union, we conclude that a police officer does not act in furtherance of his public duties when speaking as a representative of the police union. We thus hold that a reasonable jury could find that Ellins's speech, made as a representative and president of the police union, was made in his capacity as a private citizen.

## C.

The district court also determined that Ellins failed to establish that he suffered an "adverse employment action." Ellins argued that the failure to award him the five percent salary increase during the period from the date he submitted his P.O.S.T. application, February 26, 2009, to the date he began to serve his May 2009 suspension constituted an adverse employment action. The district court rejected this argument, reasoning that Ellins did not demonstrate that he was entitled to the pay increase during that period because while the MOU provided for a five percent pay raise, it "[did] not state when the pay raise becomes effective."

We have specifically concluded that "an adverse employment action exists where an employer's action negatively affects its employee's compensation." *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004); *see also Hollister v. Tuttle*, 210 F.3d 1033, 1034–35 (9th Cir. 2000) (holding that alleged discrimination in merit pay increases and salary raises against tenured professor alleging retaliation for his protected speech would "constitute denials of governmental benefits redressable by § 1983"); *Manhattan Beach Police Officers Ass'n, Inc. v. City of Manhattan Beach*, 881 F.2d 816, 819 (9th Cir. 1989) (noting that a public employer cannot withhold an economic benefit "such as a higher salary" in retaliation for activities protected by the First Amendment). Even the denial of a minor financial benefit may form the basis of a First Amendment claim. *See Elrod v. Burns*, 427 U.S. 347, 359 n.13 (1976) (holding that First Amendment rights are infringed "both where the government fines a person a penny . . . and where it withholds

the grant of a penny" to punish or suppress protected activities).

In addressing a First Amendment retaliation claim, we also examine whether "the actions taken by the defendants were reasonably likely to deter [the public employee] from engaging in protected activity under the First Amendment." *Anthoine*, 605 F.3d at 750 (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003)). The government's act of retaliation "need not be severe and it need not be of a certain kind." *Coszalter*, 320 F.3d at 975. Indeed,

> The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases. The goal is to prevent, or redress, actions by a government employer that chill the exercise of protected First Amendment rights . . . . Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment rights.

*Id*. (internal quotation marks and citation omitted). Thus we must determine, in light of the record evidence, whether a jury could reasonably find that Diaz's withholding of approval of the P.O.S.T. application, which delayed and denied Ellins a portion of his pay increase, was designed to retaliate against and chill Ellins's political expression.

Ellins submitted his P.O.S.T. application on February 26, 2009. MOU Article 23 provides that "[a]ny officer who has an Advanced P.O.S.T. Certificate shall receive an additional 5% pay over said officer's base salary." Diaz admits that

although she knew that Ellins had generally satisfied the requirements necessary to receive the Advanced P.O.S.T. certificate, she deliberately delayed signing Ellins's P.O.S.T. application until December 2009. Diaz also admits that she backdated his pay increase in an attempt to convince Ellins to drop this lawsuit, but only to June 2009, the date he returned from his suspension.[5]

Construing these facts in the light most favorable to Ellins, a reasonable finder of fact could conclude that Diaz's failure to sign his P.O.S.T. application deprived Ellins of a pay raise from the date he was entitled to the pay raise to the date to which Diaz chose to backdate her approval. The record indicates that Ellins's pay raise would have taken effect in late February or early March had Diaz not delayed in signing his P.O.S.T. application. Diaz declares that the five percent pay increase normally takes effect on the date the Commission on Peace Officer Standards and Training issues a P.O.S.T. certificate. While the record does not specify how long this process normally takes, we can infer that the certificate would have been issued within days after Ellins submitted his application to Diaz on February 26, 2009. In fact, as Diaz acknowledges, the Commission issued Ellins's certificate only four days after Diaz eventually signed it. It is a fair inference that Ellins would have received the pay increase to which the P.O.S.T. certificate entitled him within a similar four-day

---

[5] Diaz's testimony also indicates that she personally imposed Ellins's 160-hour suspension without pay. Although Ellins's misconduct occurred in July 2008 and an internal affairs investigation began in August 2008, the suspension took effect on May 7, 2009, after Diaz became aware of the no-confidence vote. If any part of this sanction is attributable to Diaz's alleged retaliatory motives, Ellins's economic loss from the delayed P.O.S.T. certification would be even greater.

period. Therefore, a jury could find that Ellins was deprived of the five percent pay raise from roughly March 2 to June 3, 2009, when he returned from serving his suspension.

Had Ellins not sued, he likely would have been deprived of the five percent raise for a longer period, from late February 2009 to December 2009. Diaz admits that Ellins was only given the retroactive pay raise with the hope that he would "forego [sic] this litigation." However, we do not focus on the "ultimate effects" of each employment action, but on the "deterrent effects." *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) (adopting the EEOC standard for identifying adverse employment actions). That Ellins had to threaten and then actually file suit to even partially recover the pay increase is more than sufficient to demonstrate the deterrent effect on protected speech Diaz's delay in signing Ellins's P.O.S.T. application worked. Such deprivation of salary is reasonably likely to deter employees from engaging in protected activity and is sufficient to constitute an adverse employment action. *See Manhattan Beach,* 881 F.2d at 819; *Fonseca*, 374 F.3d at 847 (holding that improper assignment of overtime opportunities and pay constitutes adverse employment action for purposes of § 1983). Therefore, Ellins introduced sufficient evidence of an adverse employment action to defeat a grant of summary judgment.

## D.

The district court also erred in concluding that Ellins failed to produce evidence that his speech and the adverse employment action were sufficiently related such that the speech was a substantial or motivating factor in Diaz's decision against signing the P.O.S.T. application. Although

Diaz was aware of three pending investigations of Ellins that she claimed justified the delay, Ellins adduced sufficient evidence to raise a genuine dispute of material fact on this question.

To establish that retaliation was a substantial or motivating factor behind an adverse employment action, a plaintiff may introduce evidence that (1) the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech; (2) the employer expressed opposition to the speech, either to the speaker or to others; or (3) the proffered explanations for the adverse action were false and pretextual. *Coszalter*, 320 F.3d at 977. Ellins brought forth sufficient evidence of both temporal proximity and Diaz's opposition to his speech to preclude summary judgment on the issue of "substantial or motivating factor."

Ellins provided evidence of a relatively close temporal link between his protected speech and the adverse employment action. He led the no-confidence vote in October 2008, and according to Diaz, press releases regarding the vote issued in October and November 2008. Ellins submitted his P.O.S.T. application on February 26, 2009. Diaz testified that she initially decided not to sign the application in February 2009. The alleged retaliatory act thus occurred between four and five months after the no-confidence vote, and between three and four months after the press releases issued. We established in *Coszalter* that "a specified time period cannot be a mechanically applied criterion" for an inference of retaliation; instead, "[w]hether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding

circumstances." 320 F.3d at 978. Nevertheless, we also held that "[d]epending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation." *Coszalter*, 320 F.3d at 977. The four-to-five month period between Ellins's protected speech and Diaz's refusal to sign his P.O.S.T. application falls easily within the range that we concluded supports an inference of retaliation in *Coszalter*.

Ellins also introduced sufficient evidence to withstand summary judgment as to Diaz's opposition to his protected speech. In *Ulrich v. City and County of San Francisco*, 308 F.3d 968 (9th Cir. 2002), we held that expressions of opposition similar to those made by Diaz are sufficient to establish that the protected speech was a substantial motivating factor for an adverse employment action. Ulrich, a physician who was under investigation for professional incompetence, protested the city's decision to lay off a class of physicians at a hospital and publicly displayed his resignation letter. *Id*. at 972, 980. After an administrator saw the letter, she reported it to other administrators because she was "concerned" that the letter was "potentially negative" and may have been "widely disseminated." *Id.* at 980. When Ulrich realized that his resignation triggered a reporting requirement because the investigation was pending, he attempted to rescind his resignation so that he could be reinstated. *Id.* at 973. The hospital refused to accept Ulrich's rescission attempt. *Id.* We held that even though the administrator had neither warned Ulrich nor told others he should be fired, the evidence of the administrator's opposition was sufficient, given other evidence of timing and pretext, to support a jury finding of retaliatory motive in the hospital's refusal to reinstate Ulrich. *Id*. at 981.

Just as the administrator in *Ulrich* expressed "concern" to others regarding the resignation letter, Diaz admits that she expressed "disappointment" and "dismay" to others in the wake of the no-confidence vote and press releases. She expressed this disappointment to her captain, telling him that she thought the press release was "unfortunate" and that she wished they could have "resolved these issues by continuing to meet in person" because the no-confidence vote and press releases suggested that the SMPA "had chosen to go way beyond any good-faith effort to try to resolve differences." Diaz also "spoke briefly" to others in the department about her feeling "disappointed and disheartened that the [SMPA] had chosen what [she] thought was a counter-productive action." The similarity between Diaz's expressed sentiments and those at issue in *Ulrich* suggests that Ellins has, at the very least, raised a genuine dispute of material fact as to whether Diaz opposed the no-confidence vote and related press releases.

We have held that evidence of one of the three *Coszalter* factors may be sufficient to allow a plaintiff to prevail in a public employee retaliatory speech claim. *See, e.g., Marable v. Nitchman*, 511 F.3d 924, 930 (9th Cir. 2007) (allowing a close temporal connection to establish substantial motive even though defendants claimed no knowledge of the employee's protected speech and asserted independent reasons for disciplining the employee). That Ellins has not demonstrated pretext or falsity at this stage, where the district court ruled that Ellins has not made out a prima facie case, is not fatal to his claim.

**E.**

Diaz argues that even if Ellins established his prima facie case of First Amendment retaliation, summary judgment in her favor can be upheld because she had an "adequate justification" for not signing Ellins's P.O.S.T. application, given Ellins's disciplinary record, especially the pending criminal investigation by the L.A. District Attorney that she had initiated.  Moreover, she argues that these factors demonstrate that she would not have signed Ellins's P.O.S.T. application irrespective of the no-confidence vote and press releases.  Whether Diaz would have withheld her signature in the absence of the no-confidence vote and the press releases, and whether she had an adequate justification for doing so, are entirely questions of fact.  *Eng*, 552 F.3d at 1072; *see also Mabey v. Reagan*, 537 F.2d 1036, 1045 (9th Cir. 1976) ("[T]he only way to erect adequate barriers around First Amendment freedoms is for the trier of fact to delve into the motives of the decisionmaker.").

In *Mabey*, we opined that when "questions of motive predominate in the inquiry about how big a role the protected behavior played in the decision, summary judgment will usually not be appropriate."  537 F.2d at 1045.  Although Diaz's reliance on the impending investigations supports her argument that she would have refused to sign the P.O.S.T. application notwithstanding Ellins's purported protected speech, Diaz also admitted that she had approved the P.O.S.T. applications of four other officers who had undergone internal investigations.  The record before us is not undisputed; Diaz herself provides evidence that could support either finding.

**IV.**

Nor is Diaz entitled to qualified immunity under the circumstances presented here. The district court held that even assuming a First Amendment violation, Defendants had "no indication" that Diaz's conduct was unlawful. The district court reasoned that there was no case law that specifically held "that a police officer suffers a First Amendment violation when a certifying officer delays approval of an application that requires a certification of the applicant's good moral character." However, the district court framed the inquiry much too narrowly. The question is not whether an earlier case mirrors the specific facts here. Rather, the relevant question is whether "the state of the law at the time gives officials fair warning that their conduct is unconstitutional." *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 1003 (9th Cir. 2010) (en banc) ("[T]he specific facts of previous cases need not be materially or fundamentally similar to the situation in question.") (citing *Hope v. Pelzer,* 536 U.S. 730, 742 (2002)); *White v. Lee*, 227 F.3d 1214, 1238 (9th Cir. 2000) ("Closely analogous preexisting case law is not required to show that a right was clearly established."); *see also Schwenk v. Hartford,* 204 F.3d 1187, 1198 (9th Cir. 2000); *Mendoza v. Block,* 27 F.3d 1357, 1361 (9th Cir. 1994); *Alexander v. Perrill,* 916 F.2d 1392, 1397–98 (9th Cir. 1990). Viewing Diaz's actions in the light most favorable to Ellins, we conclude that she acted unreasonably in light of clearly established law.

To determine whether a government official is entitled to qualified immunity, we ask two questions: whether the official violated a statutory or constitutional right, and whether that right was clearly established at the time of the challenged

conduct. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). We may address these questions in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). We first address whether Ellins alleges a violation of a right that was clearly established when Diaz acted in 2009.

For purposes of qualified immunity, we resolve all factual disputes in favor of the party asserting the injury. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson,* 555 U.S. at 236. In light of the above discussion, we can reasonably assume both that Ellins's protected speech was a substantial or motivating factor in Diaz's decision, and that Diaz would not have delayed signing Ellins's P.O.S.T. application in the absence of his protected speech. Ellins's First Amendment right to be free from retaliation for engaging in protected speech was clearly established in 2009 when Diaz allegedly delayed the signing of his P.O.S.T. application. Forty years previously, in 1968, the Supreme Court established that public employees have a First Amendment right to be free from retaliation for commenting on matters of public concern, even when the protected comments are critical of their employers. *Pickering*, 391 U.S. at 571 (holding that a teacher could not be dismissed for criticizing school board's budget management, even though the criticism included false allegations against board members, because the speech addressed a matter of public concern and the speech did not prevent the school district's efficient functioning). In *Connick*, decided in 1983, the Supreme Court reaffirmed this right. Although the Court found that the plaintiff's speech dealt only with private employee concerns, the Court stressed that speech on matters of public concern occupies the "highest rung of the heirarchy [sic] of First Amendment values, and is

entitled to special protection." *Connick*, 461 U.S. at 145 (quoting *NAACP v. Claiborne Hardware*, 458 U.S. 886 (1982)). In *Coszalter*, we concluded that city officials, who were sued by former city employees for alleged First Amendment retaliation, were not entitled to qualified immunity because "both the constitutional protection of employee speech and a First Amendment cause of action for retaliation against protected speech were clearly established" at least as of 1989. 320 F.3d at 979 (relying on *Pickering*, 391 U.S. at 571; *Allen v. Scribner*, 812 F.2d 426 (9th Cir. 1987); *Anderson v. Central Point Sch. Dist.*, 746 F.2d 505 (9th Cir. 1984); and *Thomas v. Carpenter*, 881 F.2d 828 (9th Cir. 1989) for the proposition that the law was clearly established).

When Diaz acted in 2009, it was also clearly established under both Supreme Court and Ninth Circuit precedent that "the type of sanction . . . 'need not be particularly great in order to find that rights have been violated.'" *Hyland v. Wonder*, 972 F.2d 1129, 1135 (9th Cir. 1992) (quoting *Elrod v. Burns*, 427 U.S. 347, 359 n.13 (1976)). It was also clearly established that deprivation of an employee's salary is unconstitutional if levied in retaliation for protected speech. *See Manhattan Beach*, 881 F.2d at 818–19 (9th Cir. 1989) (holding that salary is unconstitutionally withheld if on the basis of protected activities). That we have not decided a case in which the retaliation took the specific form of decreased pay due to a delayed P.O.S.T. certification is irrelevant.

Finally, when Diaz acted it was clearly established that a police union representative's speech is entitled to First Amendment protection. In *McKinley*, we held that a police officer who spoke as a union representative engaged in

protected speech. 705 F.2d at 1114–15 (applying the standard set forth in *Pickering*, 391 U.S. 563, and *Connick*, 461 U.S. 138, and holding that matters relating to "the competency of the police force" are surely of "great public concern"); *see also Fuerst*, 454 F.3d at 774; *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1123 (7th Cir. 2009). In *Fuerst*, another First Amendment retaliation case, the Seventh Circuit distinguished between speech made by a sheriff under his "union president's hat" and speech that could legitimately form the basis for denying the sheriff a promotion. 454 F.3d at 775. Ellins's expressive act of leading a union vote followed by related press releases was unmistakably performed under his "union president hat," and thus constituted protected speech.

It is true that if Diaz "could . . . have reasonably but mistakenly believed that . . . her conduct did not violate a clearly established constitutional right, [s]he is entitled to qualified immunity." *Hunt v. Cnty of Orange*, 672 F.3d 606, 615–16 (9th Cir. 2012) (internal quotation marks and citation omitted). However, in light of the Supreme Court's longstanding and unequivocal precedents protecting employee speech, we conclude that a reasonable official in Diaz's position would have known that delaying Ellins's application to the P.O.S.T. program because of his union activity, which resulted in a lower salary than that to which he otherwise would have been entitled, violated Ellins's First Amendment rights; that in leading a union vote Ellins acted as a private citizen addressing a matter of public concern; and that depriving Ellins of salary in retaliation for his protected speech was unconstitutional.

## V.

The district court correctly held that the City of Sierra Madre is not liable for Diaz's allegedly retaliatory conduct under a *Monell* theory of liability. *Monell.*, 436 U.S. 658 (1978). Under *Monell*, municipalities are subject to damages under § 1983 in three situations: when the plaintiff was injured pursuant to an expressly adopted official policy, a long-standing practice or custom, or the decision of a "final policymaker." *Delia v. City of Rialto*, 621 F.3d 1069, 1081–82 (9th Cir. 2010). The district court properly concluded that Ellins did not adduce sufficient evidence of an official policy or custom of retaliatory delay. The city could be liable on a *Monell* theory only if Diaz was a final policymaker or if the city's final policymaker ratified Diaz's alleged retaliation. We conclude that city manager Elaine Aguilar, not Diaz, was the city's final policymaker. Because Ellins does not allege that Aguilar knew of Diaz's alleged retaliatory motive for delaying signature of Ellins's P.O.S.T. application, the City is not liable for Ellins's injury.

Whether an official is a policymaker for *Monell* purposes is a question governed by state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988). California state law permits municipalities to enact regulations creating a "city manager" form of governance. Gov. Code § 34851. The City of Sierra Madre has enacted such regulations. *See* Sierra Madre Mun. Code § 2.08.010 (2000). The City has delegated to the city manager the "authority to control, order, and give directions to all heads of departments and to subordinate officers and employees of the city . . . ." Sierra Madre Mun. Code § 2.08.070(B) (2000). More specifically, it is the city manager's duty to "appoint, discipline, remove, promote, and

demote any and all officers and employees of the city except the city clerk, city treasurer, or city attorney . . . ." Sierra Madre Mun. Code § 2.08.070(C) (2000). The Sierra Madre Personnel Rules and Regulations further reinforce these provisions by expressly charging the city manager with administering the City's personnel rules. These local ordinances and regulations establish that city manager Elaine Aguilar, not Diaz, possesses final policymaking authority over police employment decisions.

Although it is undisputed that Aguilar approved Diaz's decision to delay signing Ellins's P.O.S.T. application, Ellins does not allege that Aguilar knew that the decision was in retaliation for protected speech or that she ratified the decision despite such knowledge. *See Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999) (plaintiff must adduce evidence that the final policymaker approved both a subordinate's decision and the improper basis for that decision to survive summary judgment on a ratification theory). Ellins has thus failed to raise a genuine issue of material fact regarding whether his alleged injury is attributable to the City of Sierra Madre's policymaker.

## VI.

We affirm the district court's grant of summary judgment to the City of Sierra Madre because the City is not liable under *Monell* for Diaz's actions. However, we reverse the district court's grant of summary judgment to Diaz and remand

because genuine issues of material fact exist on the elements of Ellins's First Amendment retaliation claim.

**AFFIRMED in part; REVERSED in part; REMANDED for proceedings consistent with this opinion.** Each party shall bear its own costs.

---

Rawlinson, Circuit Judge, concurring in the judgment:

I concur in the judgment reversing the district court's entry of summary judgment in favor of defendant Marilyn Diaz. I also agree that entry of summary judgment in favor of the City of Sierra Madre was warranted due to the lack of material issues of fact regarding a city policy that resulted in the alleged constitutional violations. I write separately to clarify that this case was decided on summary judgment and no definitive rulings on the factual issues should have been made by the district court or should be made by us. On summary judgment review, we determine whether material issues of fact were raised by the party opposing summary judgment after reviewing the evidence in the light most favorable to that opposing party. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). Resolution of those factual issues is reserved for trial before a factfinder. For that reason, we should limit our discussion to whether Ellins raised material issues of fact, thereby rendering entry of summary judgment inappropriate.

At the summary judgment stage, the non-moving party need only raise a material issue of fact rather than carrying the ultimate burden of persuasion. *See Fairbank*, 212 F.3d at

531. As the district court acknowledged, whether Ellins suffered an adverse employment action was "purely a question of fact." *District Court Opinion*, p. 6 (citation omitted). The Memorandum of Understanding between the City and the bargaining unit for the officers provided for a 5 percent pay increase if an officer obtained an Advanced POST Certificate. This circumstance raised a material question of fact regarding whether Chief Diaz's failure to sign Ellins's application for an Advanced POST certificate resulted in a loss of pay, thereby precluding summary judgment. *See Fairbank*, 212 F.3d at 531. Similarly, there was disputed evidence in the record regarding whether Chief Diaz was motivated by Ellins's criticism of her performance. Construing the evidence presented by Ellins in the light most favorable to him, *i.e.*, that Chief Diaz had never previously refused to sign a similar application, also raised a material issue of fact.

Having determined that material issues of fact remain for trial, I would go no further. More specifically, I decline to join the majority's discussion of whether Ellins established a First Amendment retaliation claim, and its conclusion that Ellins spoke in his capacity as a private citizen rather than as a public employee. *See Majority Opinion*, p. 16. In my view, this is not a determination that should be made at this stage of the proceedings. Because the record is void regarding whether the activities Ellins undertook as union president were within the realm of his official duties, the determination regarding whether his activities were undertaken as a private citizen is more appropriately made by the factfinder.

The majority relies primarily upon the Seventh Circuit's decision in *Fuerst v. Clarke*, 454 F.3d 770, 774 (7th Cir. 2006), where the court held, without any analysis, that the

employee's speech as a union representative was not made as a public employee.[1]  The two district court cases from district courts in D.C., *Baumann v. District of Columbia*, 744 F. Supp. 2d 216, 224 (D.D.C. 2010), and *Hawkins v. Boone* 786 F. Supp. 2d 328, 335 (D.D.C. 2011) simply parroted the Seventh Circuit's ruling in *Fuerst*, again without any analysis. I am not confident that reliance on these cases supports concluding that Ellins was speaking as a private citizen when he criticized Chief Diaz.

In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the United States Supreme Court discussed how we are to determine whether a public employee should be treated as a private citizen in the First Amendment context.  First, we must determine whether the employee "spoke as a citizen on a matter of public concern. . . ."  *Id*. at 418 (citation omitted). If the employee spoke as a private citizen as opposed to within the "course of performing [his] official duties," the employee "retain[s] some possibility of First Amendment protection . . ." *Id*. at 423.

There is no doubt in this Circuit that whether an employee speaks as a private citizen is a question of fact rather than an issue of law.  *See Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009) ("The question of the scope and content of a plaintiff's job responsibilities is a question of fact . . .") (citation omitted); *see also Karl v. City of Mount Terrace*, 678 F.3d 1062, 1071 (9th Cir. 2012) (same).

---

[1] The Seventh Circuit referenced its *Fuerst* decision in *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1123 (7th Cir. 2009), but again made the public-employee-private-citizen determination without undertaking an in-depth analysis of the issue.

The record in this case is devoid of any description of Ellins's job duties. *Cf. id.* (discussing the plaintiff's testimony regarding the scope of her job duties). For all we know, Ellins's job duties could encompass his union responsibilities. *See*, *e.g.*, *People v. Creath*, 31 Cal. App. 4th 312, 315 (1995) (noting that officers and directors of the firefighters union received compensation to perform union duties).

In sum, I agree with the majority that this case should be remanded. However, upon remand all questions of fact, including whether Ellins spoke as a public employee or as a private citizen, should be resolved by the factfinder. For that reason, I concur only in the judgment affirming in part, reversing in part and remanding for further proceedings.