[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-12130

_____

D.C. Docket No. 1:10-cv-00836-JOF

RICHARD J. HUBBARD,

Plaintiff-Appellant,

versus

CLAYTON COUNTY SCHOOL DISTRICT,
A. MICHELLE STRONG, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 27, 2014)

Before MARCUS and ANDERSON, Circuit Judges, and GOLDBERG,* Judge.

ANDERSON, Circuit Judge:

_____

*Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting by
designation.

Richard Hubbard appeals the district court's grant of summary judgment in favor of the Clayton County School District ("School District").  Hubbard argues that he was retaliated against by the School District because he made public statements to the press regarding the accreditation investigation of the School District.

## I.    FACTS AND PROCEDURAL BACKGROUND

Richard Hubbard was employed by the Clayton County School District as a teacher and then an administrator from 1996 to 2006.  He had a yearly, renewable contract with the School District and was scheduled to be assistant principal for Kemp Elementary School during the school year of 2006-2007.  His job duties as assistant principal did not include speaking to the media, and the School District maintained a Department of Communications for that purpose.  In 2006, Hubbard was elected president of the Georgia Association of Educators ("GAE"), a private, non-profit professional association that represents public educators in Georgia.  Among other things, GAE serves as the voice for education in Georgia and the president is explicitly tasked to be that voice.

During his tenure as president of GAE, the relationship between Hubbard and the School District was as follows.  For several decades, the practice of the GAE and the several school districts from which it recruits its presidents has been that the president works fulltime for GAE and GAE pays for the full compensation

package for its president.  However, because an employee-president of GAE could not continue his benefits and retirement contribution except as a school employee, GAE and the school districts have arranged for the president to remain technically as an employee of the school district from which he was recruited, such that the president's salary and benefits are paid by that school district and reimbursed in full by the GAE.  The practice has been to call these "on-loan" arrangements. Under these arrangements, the president would continue to accrue employment benefits (e.g. retirement and insurance) with his former school district and was expected to return to the school district upon completion of his term as president. The School District, GAE, and Hubbard followed this practice and exchanged correspondence reflecting the agreement.  GAE actually paid Hubbard more than $40,000 in excess of what he had received from the School District.  When Hubbard took office as president in July 2006, the School District released him from his duties for the School District for the duration of his tenure as president.

On February 15, 2008, Hubbard was acting in his capacity as spokesperson for the GAE at the Georgia State Capitol.  When asked about the recent SACS[1] Report critical of the School District and various members of its local Board of Education, Hubbard made public remarks about the Clayton County Board of Education's accreditation crisis: "If the allegations in the SACS Report are true,

---

[1]    SACS is the Southern Association of Colleges and Schools and is the regional body for the accreditation of degree-granting higher education institutions in the Southern states.

3

then for the good of the children and the system, individuals on the Board should step down." On March 3, 2008, the Board voted to discontinue any employee leave that was not specifically allowed by Board Policy; this included the "on-loan" agreements like Hubbard's. Four employees were affected by the decision, but Hubbard points out that the other three were permitted to return to employment with the School District.

There were three other "on-loan" arrangements like Hubbard's and all of the loaned employees were told to return to the classrooms and receive working assignments. Hubbard responded to his letter, which informed him of the decision and assigned him as an assistant principal, by resigning from the School District. By contrast, the head of the local CCEA[2] (who also called for the Board's resignation in the wake of the SACS Report) contacted the Board and arranged to take leave instead. When Hubbard learned of this, he tried to rescind his resignation. Although the School District's in-house counsel emailed Hubbard's attorney that "[w]e have no problem allowing him to rescind his resignation," the Board members tabled the issue. When the new Board convened (after all of the members had either resigned or been removed by Governor Deal), its new counsel determined that Hubbard's rescission of his resignation was ineffective because he had already cashed out his leave and had not reported to his assigned school.

---

[2]    The CCEA is the Clayton County Education Association.

Hubbard brought suit after the end of his second term as president, when he tried to return to the School District but was rebuffed.  He argued, inter alia, that the School District retaliated against him for his speech in violation of his First Amendment rights.  The School District asserted in its motion for summary judgment that Hubbard was acting pursuant to his official job duties for the School District and thus enjoyed no First Amendment protection under Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1951 (2006).  The district court granted summary judgment for the School District, holding that Hubbard's speech was pursuant to his official duties for the School District and thus was not protected under Garcetti.  The district court entered final judgment for the School District and Hubbard appeals.

## II.    ISSUE

The narrow issue before us in this appeal is whether the district court erred in granting summary judgment in favor of the School District on the basis that Hubbard was speaking pursuant to his official duties for the School District and thus had no First Amendment protection under Garcetti.

## III.    DISCUSSION

While a government employer "may not demote or discharge a public employee in retaliation for speech protected under the first amendment, a public employee's right to freedom of speech is not absolute."  Bryson v. City of

5

Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989).  As the Supreme Court has

explained:

> [T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35 (1968).

In the subsequent case Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1951

(2006), the Supreme Court refined its Pickering analysis.  The Court stated that

while the government has the ability to restrict speech, the restrictions must be

directed at speech that has the potential to affect the government employer's

operations.  Id. at 418, 126 S. Ct. at 1958.  As long "as employees are speaking as

citizens about matters of public concern, they must face only those speech

restrictions that are necessary for their employers to operate efficiently and

effectively."  Id. at 419, 126 S. Ct. at 1958.  The Court then held that "when public

employees make statements pursuant to their official duties, the employees are not

speaking as citizens for First Amendment purposes, and the Constitution does not

insulate their communications from employer discipline."  Id. at 421, 126 S. Ct. at

1960.  Thus, a threshold question to ask in the government employee context is

6

whether the speech was made by the employee in his capacity as an employee or as a private citizen.

Hubbard relies on several cases from other circuits that have held, post-Garcetti, that the speech of an employee acting in his capacity as a representative of a union is not made as an employee but as a citizen. The Seventh Circuit, in Fuerst v. Clarke, 454 F.3d 770, 774 (7th Cir. 2006), stated that Garcetti was "inapposite" because the plaintiff deputy sheriff's statements were made in the capacity of his role as union president, not deputy sheriff. See also Nagle v. Village of Calumet Park, 554 F.3d 1106, 1123 (7th Cir. 2009) (holding statements made in capacity as union official not subject to rule announced in Garcetti). The Ninth Circuit, in Ellins v. City of Sierra Madre, 710 F.3d 1049, 1059-60 (9th Cir. 2013), similarly held that speech made in the context of the plaintiff's role as a union official was made as a private citizen and did not fall under Garcetti's strictures.

We agree with Hubbard that his speech was made in his capacity as president of GAE, and not as an employee of the School District. Thus, his speech did not fall under Garcetti. Under the agreement with the School District, Hubbard was "on-loan" to GAE. This meant that he only technically remained an employee of the School District during his tenure as president of GAE. He had no responsibilities as a School District employee during that tenure, and his

7

relationship with the School District was only a formality so that he could retain his benefits.  Hubbard performed no duties for the School District during his time working for the GAE.  Indeed, the salary GAE provided to Hubbard was significantly higher than what he earned as assistant principal with the School District.  Applying the practical inquiry mandated by Garcetti, 547 U.S. at 424, 126 S. Ct. at 1961-62, the substance of his relationship with the School District was that he was on leave from the School District.  Thus, Hubbard's speech was more clearly separate from any duties for the School District than the cases upon which Hubbard relies because in those cases, the plaintiffs remained active employees of their governmental employers, while Hubbard was on leave to be the fulltime president of his trade association.[3]

---

[3]    The School District does not dispute that Hubbard worked full time as president of GAE, and does not dispute that he had no duties for the School District as such.  Rather, the School District seems to argue that all of Hubbard's duties for GAE were somehow also duties for the School District.  This argument is counterfactual.  The only hint of evidence offered by the School District is a congratulatory letter from the Superintendent of the School District upon Hubbard's election.  Although the letter indicated pride that the School District would be "represented" by Hubbard in his role as leader of GAE, the obvious meaning of that was simply an acknowledgement that Hubbard's having been elected to lead a prestigious statewide educational organization would enhance the reputation of the School District.  Neither that letter, nor any other evidence in the present record, could reasonably be construed as somehow transforming Hubbard's official duties for GAE into also being official duties for the School District.  Although the parties labeled the arrangement as Hubbard being "on-loan" to GAE, the substance of the arrangement was that Hubbard was on leave from the School District in order to work fulltime for GAE.  It is clear that Hubbard's official duties on behalf of GAE were not official duties for the School District.  Thus, this case is very different from Watts v. Florida International University, 495 F.3d 1289 (11th Cir. 2007), which suggested that a university student—who had to take a field practicum course as part of his degree requirements, id. at 1291, and whose practicum was employment in a private psychiatric institution—was both a student and employee of the university, id. at 1294.  In that very different situation, the work of the student in the practicum (i.e., "on-loan" work for a different entity) might well have been part of

8

A crucial rationale for <u>Garcetti</u>'s holding that statements made by public employees pursuant to their official duties are not protected by the First Amendment is the governmental employer's right to control official communications.

> Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission.

<u>Id.</u> at 422-23, 126 S. Ct. at 1960. It is clear that Hubbard's speech in this case was not an official communication of the School District. Rather, it is clear that Hubbard was speaking in his capacity as president of GAE; Hubbard's speech could not reasonably be attributed to the School District. Thus, the School District has no legitimate interest in controlling this speech. Accordingly, this rationale of <u>Garcetti</u> simply has no application in this case.

Because Hubbard was not speaking pursuant to any official duties for the School District, but rather was speaking in his capacity as president of GAE, the district court erred when it held that Hubbard's speech fell under the rule announced in <u>Garcetti</u>. Therefore, we vacate the district court's order and remand for further proceedings.

---

the student's official duties for the university, although the <u>Watts</u> court did not address that and did not cite <u>Garcetti</u>.

9

VACATED AND REMANDED.